RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0270p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DEJA VU OF CINCINNATI, L.L.C.,

*Plaintiff-Appellant/*
*Cross-Appellee,*

*v.*

THE UNION TOWNSHIP BOARD OF TRUSTEES et al.,
*Defendants-Appellees,*

ATTORNEY GENERAL OF THE STATE OF OHIO,
*Intervenor-Appellee/*
*Cross-Appellant.*

Nos. 00-4420/4529

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 99-00726—Sandra S. Beckwith, Chief District Judge.

Argued: December 8, 2004

Decided and Filed: June 21, 2005

Before: BOGGS, Chief Judge; MARTIN, BATCHELDER, DAUGHTREY, MOORE, COLE,
CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** H. Louis Sirkin, SIRKIN, PINALES, MEZIBOV & SCHWARTZ, Cincinnati, Ohio,
Bradley J. Shafer, SHAFER & ASSOCIATES, Lansing, Michigan, for Appellant. Stephen P.
Carney, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, Lawrence Edward
Barbiere, SCHROEDER, MAUNDRELL, BARBIERE & POWERS, Cincinnati, Ohio, for
Appellees. **ON BRIEF:** H. Louis Sirkin, Jennifer M. Kinsley, SIRKIN, PINALES, MEZIBOV &
SCHWARTZ, Cincinnati, Ohio, Bradley J. Shafer, SHAFER & ASSOCIATES, Lansing, Michigan,
for Appellant. Stephen P. Carney, Douglas R. Cole, Sharon A. Jennings, OFFICE OF THE
ATTORNEY GENERAL OF OHIO, Columbus, Ohio, Lawrence Edward Barbiere, SCHROEDER,
MAUNDRELL, BARBIERE & POWERS, Cincinnati, Ohio, for Appellees. Scott D. Bergthold,
LAW OFFICE OF SCOTT D. BERGTHOLD, Chattanooga, Tennessee, Jack R. Burns, Bellevue,
Washington, for Amici Curiae.

GILMAN, J., delivered the opinion of the court, in which BOGGS, C. J., BATCHELDER,
GIBBONS, ROGERS, SUTTON, and COOK, JJ., joined. CLAY, J. (pp. 18-23), delivered a
separate opinion concurring in part and dissenting in part, in which DAUGHTREY and COLE, JJ.,

1

joined.    MARTIN, J. (p. 24), delivered a separate opinion dissenting in part, in which DAUGHTREY and MOORE, JJ., joined.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge.  Deja Vu of Cincinnati, L.L.C. operates an adult cabaret in Union Township, Clermont County, Ohio.  In 1999, Union Township enacted an ordinance (locally known as a resolution) in an attempt to minimize the adverse secondary effects of sexually oriented businesses.  Deja Vu filed a complaint in the United States District Court for the Southern District of Ohio, alleging that the resolution violated the First and Fourteenth Amendments to the United States Constitution.  The district court granted in part and denied in part Deja Vu's subsequent motion for a preliminary injunction.  In response to this decision, Union Township amended the resolution to eliminate the provisions that the district court concluded were likely to be held unconstitutional.  Union Township also eliminated other provisions that were not found to be suspect by the district court.

Deja Vu appealed, claiming that the district court erred in denying in part its motion for a preliminary injunction.  The Ohio Attorney General, who intervened in the lawsuit to defend the constitutionality of Ohio's enabling statute, filed a cross-appeal.  A divided panel of this court ruled in favor of Deja Vu on the following two points: (1) that the resolution was an unconstitutional prior restraint on protected First Amendment expression because it failed to provide for prompt judicial review of an adverse licensing decision, and (2) that the resolution's more restrictive closing times for adult cabarets without liquor licenses as compared to those with liquor licenses was a violation of the First and Fourteenth Amendments.  *Deja Vu of Cincinnati, L.L.C. v. Union Township Bd. of Trs.*, 326 F.3d 791 (6th Cir. 2003).

We granted a rehearing en banc to reconsider whether the resolution is consonant with both the First and Fourteenth Amendments.  For the reasons set forth below, we **AFFIRM** the district court's decision to deny in part the preliminary injunction, express **NO OPINION** on the district court's decision to grant in part the preliminary injunction in light of Union Township's subsequent modification of the resolution, and **REMAND** the case for further proceedings consistent with this opinion.

**I.  BACKGROUND**

Deja Vu began operating an adult cabaret in Union Township in April of 1999.  The nightclub features performances by clothed, semi-nude, and nude dancers.

In August of 1999, the Board of Trustees of Union Township (the Board) enacted Resolution No. 99-15 to regulate the licensing of cabaret-style nightclubs that feature adult entertainment.  The resolution was enacted pursuant to the authority granted to Union Township by Ohio Revised Code § 503.51-59 for the purpose of protecting the "public health, safety and welfare."  Resolution No. 99-15 § A.  In particular, the resolution states that it was passed on the basis of the Board's "review of other cities' studies and citizen comments regarding the secondary effects of sexually oriented businesses," which provided "convincing evidence" that such businesses "have a deleterious effect on both existing businesses around them and the surrounding residential areas . . . ."  *Id*. § C.

Deja Vu filed its complaint in September of 1999, alleging that various provisions of Resolution No. 99-15 violate the First and Fourteenth Amendments to the United States Constitution.  At the same time, Deja Vu filed a motion for a preliminary injunction. Consideration of the motion was stayed pending a decision by the United States Supreme Court in *City of Erie v.*

*Pap's A.M.*, 529 U.S. 277 (2000) (holding that public indecency ordinances may be treated as if they were content-neutral regulations). After the Supreme Court issued its decision in *City of Erie*, Deja Vu renewed its motion for a preliminary injunction. The district court granted the motion in part, enjoining Union Township from enforcing the sections of Resolution No. 99-15 that pertain to warrantless health and safety inspections of the premises, §§ (L)(1) and (M)(2), and to the disclosure of personal information concerning every partner and shareholder of the business, §§ (D)(5)(d) and (e). In October of 2000, the district court denied Deja Vu's motion to alter or amend the preliminary injunction.

Deja Vu filed a timely appeal in November of 2000. The Attorney General of Ohio, who intervened in the case to defend the constitutionality of Ohio Revised Code § 503.51-59, cross-appealed the district court's decision to enjoin the warrantless health and safety inspections. While the appeal and cross-appeal were pending, Union Township enacted Resolution No. 00-22 to amend and replace Resolution No. 99-15, thereby eliminating those provisions that the district court had determined were likely to be held unconstitutional. The new resolution also modified other aspects of the personal-disclosure and civil-disability provisions found in the older ordinance. For the remainder of this opinion, the term "resolution" will be used to refer to current Resolution No. 00-22.

## II. ANALYSIS

### A. Standard of review

Whether a preliminary injunction should be granted is a decision left to the sound discretion of the district court. *Allied Sys., Ltd. v. Teamsters Nat'l Auto. Transporters Indus. Negotiating Comm.*, 179 F.3d 982, 985-86 (6th Cir. 1999). A district court, in deciding whether to grant an injunction, "abuses its discretion when it applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *Schenck v. City of Hudson*, 114 F.3d 590, 593 (6th Cir. 1997). The following factors are to be considered by a district court in deciding whether to grant a preliminary injunction:

> (1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief.

*Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000). Like the parties, the district court primarily focused on the first of these four factors—whether Deja Vu is likely to succeed on the merits of its claims. We look at each of these claims in turn.

### B. Prompt judicial review

#### 1. Quasi-judicial proceeding

Deja Vu claims that the resolution is unconstitutional on its face because it fails to provide for prompt judicial review when an application for a license is denied. Citing *M.J. Kelley Co. v. City of Cleveland*, 290 N.E.2d 562 (Ohio 1972), Deja Vu contends that the resolution does not allow for the type of "quasi-judicial proceeding" required for an appeal to lie pursuant to Ohio Revised Code § 2506. *Id.* at 563 (Syllabus ¶ 1) ("[A]dministrative actions of administrative officers and agencies not resulting from quasi-judicial proceedings are not appealable to the Court of Common Pleas under the provisions of R.C. 2506.01.").

In its original memorandum and order, the district court did not address Deja Vu's argument on this point. It did, however, rule on the issue after Deja Vu again raised the argument in a motion to alter or amend the judgment. After finding that the enabling legislation passed by Ohio to allow townships to regulate adult cabarets, Ohio Rev. Code § 503.57, "provides for appeal of a denial or revocation by the Board of Trustees of a permit to operate an adult cabaret," the district court denied Deja Vu's request for a preliminary injunction on this basis.

Under the resolution, an applicant for an adult cabaret license is permitted to "present information, evidence, and testimony to the Board, at a public hearing regarding the application." Resolution No. 00-22 § (F)(1). The Board must make a decision on the application within 30 days of the application's submission. *Id.* As set forth in the Ohio Revised Code, "[a]ny person adversely affected by an order of the board denying or revoking a permit to operate an adult cabaret may appeal from the order of the board to the court of common pleas . . . in accordance with Chapter 2506[] of the Revised Code." Ohio Rev. Code § 503.57. Pursuant to Chapter 2506, "[e]very final order, adjudication, or decision of any officer, tribunal, authority, board, bureau, commission, department, or other division of any political subdivision of the state may be reviewed by the court of common pleas," but only if the final order, adjudication or decision is the product of a "quasi-judicial proceeding." Ohio Rev. Code § 2506.01; *see M.J. Kelley Co.*, 290 N.E.2d at 563 (Syllabus ¶ 1).

Proceedings of an administrative agency "are not quasi-judicial where there is no requirement for notice, hearing and the opportunity for introduction of evidence." *M.J. Kelley Co.*, 290 N.E.2d at 563 (Syllabus ¶ 2). The Ohio Supreme Court determined that the administrative proceeding before it in *M.J. Kelley Co.* was not appealable pursuant to Ohio Revised Code § 2506.01 because, in determining the lowest bidder for a city contract, the Board of Control of the City of Cleveland "was not required to give advance notice of the meeting to the bidders[,] and bidders were not required to be present at such a meeting," and that, "[i]n fact, no notice" was given to bidders. *Id.* at 565.

In contrast, the resolution in the present case provides that the "Board shall hear any application for a permit or renewal permit, at a public hearing." Resolution No. 00-22 § (F)(1). Ohio Revised Code § 503.52 requires a board of trustees to publish "in at least one newspaper of general circulation in the township notice of the public hearings, including the time, date, and place, once a week for two weeks immediately preceding the hearings." Moreover, the resolution states that, during the public hearing, "[t]he applicant shall have the opportunity to present information, evidence, and testimony to the Board . . . ." Resolution No. 00-22 § (F)(1). The resolution therefore satisfies the three requirements that define a "quasi-judicial proceeding": (1) a hearing, (2) notice, and (3) the opportunity to introduce evidence. *M.J. Kelley Co.*, 290 N.E.2d at 563 (Syllabus ¶ 2).

Deja Vu responds by citing the following four cases in support of its position that the resolution does not provide for adequate judicial review: *Local No. 2134 v. Bd. of Marion Township Trs.*, 514 N.E.2d 1386 (Ohio Ct. App. 1986); *Banjoff v. Township of Carlisle Bd. of Trs.*, No. 98CA007079, 1999 WL 239416 (Ohio Ct. App. Apr. 14, 1999) (unpublished); *Ramacciatti v. City of Cleveland*, No. 66678, 1994 WL 326238 (Ohio Ct. App. July 7, 1994) (unpublished); and *City of Huber Heights v. Liakos*, No. 2000 CV 03932 (Ohio Com. Pl. Sept 25, 2000) (unpublished). All of these cases, however, are distinguishable on their facts from the present case.

In *Local No. 2134*, the Ohio Court of Appeals held that the proceedings on a grievance filed by several employees of Marion Township were not "quasi-judicial" in nature. *Local No. 2134*, 514 N.E.2d at 1389. The Ohio Court of Appeals relied on the undisputed fact that the Marion Township Board of Trustees did not hold a hearing or provide the employees with notice. *Id.* at 1388 (stating that "at no time did [the board] hold a hearing with notice given to plaintiffs concerning the grievance"). Unlike the employees in *Local No. 2134*, who challenged the grievance procedure as

it applied to them, Deja Vu is challenging the Union Township resolution on its face. Here the resolution clearly provides for a hearing, notice, and the opportunity to introduce evidence, so that the Board is acting as a quasi-judicial administrative body when it evaluates a request for a permit.

In *Banjoff*, the Ohio Court of Appeals held that an appeal was not available pursuant to Ohio Revised Code § 2506.01 because, unlike in the case before us, the administrative proceeding initiated by Banjoff to contest Carlisle Township's failure to appoint him as a full-time firefighter did not provide "for notice, a hearing, or the opportunity to present evidence . . . ." *Banjoff*, 1999 WL 239416, at *2. The Ohio Court of Appeals similarly held in *Ramacciatti* that an administrative proceeding conducted by Cleveland's Civil Service Commission did not constitute a "quasi-judicial proceeding" because "[n]o official notice of a hearing was provided," and the plaintiff was not afforded the "opportunity to subpoena witness[es], to cross examine witnesses, or to have testimony taken under oath." *Ramacciatti*, 1994 WL 326238, at *4.

Finally, in *City of Huber Heights*, the court of common pleas's decision concerning the licensing of a sexually oriented business hinged on the biased nature of the individual who was the relevant decisionmaker. *City of Huber Heights*, No. 2000 CV 03932 (slip op.), at 12-13 ("[I]t is axiomatic that a hearing conducted before a biased individual . . . would not fulfill a requisite requirement of fundamental fairness that must pre-dominate in all quasi-judicial proceedings."). The court of common pleas emphasized that the hearing was no more than a "reconsideration" by the same individual—the City Manager—of his determination "'that probable grounds exist for denial, suspension, or revocation of a permit.'" *Id*. at 10-12 (quoting § 31 of Huber Height's sexually oriented business ordinance). In affirming the court of common pleas's decision in *City of Huber Heights*, the Ohio Court of Appeals recognized that combining the investigative and adjudicative functions in a single individual, as opposed to an institutional agency, "undermines the quality of neutrality that is the central purpose of a review process" because it gives the individual "unbridled discretion." *City of Huber Heights v. Liakos*, 761 N.E.2d 1083, 1091 (Ohio Ct. App. 2001).

Unlike in *City of Huber Heights*, the decisionmaking authority under the Union Township resolution is vested in an administrative body rather than in an individual. The Union Township resolution also takes the further precaution of vesting the investigative function in the police department and the adjudicative function in the Board. Resolution No. 00-22 § (E) (providing that the police department is responsible for preparing a written report of the results of an investigation into the background of any applicant for a permit and anyone named in the application); *id*. § (F)(1) (stating that the Board is responsible for considering "any application for a permit or renewal permit, at a public hearing").

We therefore hold that the administrative hearing provided for by the resolution constitutes a "quasi-judicial proceeding" as that term has been defined by the Ohio Supreme Court in *M.J. Kelley Co.*, 290 N.E.2d at 563 (Syllabus ¶ 2).

### 2.     *Civil proceeding*

Deja Vu also argues that the resolution does not provide for prompt judicial review because many decisions by the Board to deny or revoke licenses will likely be "issued preliminary to or as a result of a criminal proceeding," and that such decisions are unreviewable under Ohio Revised Code § 2506.01. In providing for judicial review of the Board's determinations, the Union Township resolution permits any applicant who is denied a license, or any licensee whose license is revoked, to "appeal the action of the Board in accordance with chapter 2506 of the Ohio Revised Code." Resolution No. 00-22 §§ J(1)-(2). Ohio Revised Code § 503.57 further provides that "[a]ny person adversely affected by an order of the board denying or revoking a permit to operate an adult cabaret may appeal from the order of the board to the court of common pleas . . . in accordance with Chapter 2506.[01] of the Revised Code."

Notwithstanding these explicit provisions for judicial review of the Board's adverse licensing decisions, Deja Vu contends that most decisions will be beyond the review of the Ohio courts because Ohio Revised Code § 2506.01 prohibits appeals from "any order, adjudication, or decision that is issued preliminary to or as a result of a criminal proceeding." The resolution allows the Board to deny or revoke a license if it finds that an applicant or licensee has been convicted within the past three years of a sex offense under Ohio Revised Code § 2907, or convicted within the past five years of an offense under Ohio Revised Code § 503.53(C), which prohibits adult cabaret employees from touching, fondling, or displaying their own or another person's genitals, pubic area, buttocks, or (female) breasts. Resolution No. 00-22 § (I). Deja Vu insists that where a license is denied or revoked because of a conviction under Ohio Revised Code § 2907 or § 503.53(C), the Board's public hearings and subsequent licensing decision are transformed into a "criminal proceeding" and thus shielded from judicial review by Ohio Revised Code § 2506.01.

We reject this far-reaching argument because we agree with the Ohio State Attorney General that, although not a model of clarity, the exclusionary language in Ohio Revised Code § 2506.01 is aimed at preventing criminal defendants from circumventing normal appellate procedures by precluding them from seeking interlocutory appeals in the Ohio Court of Common Pleas. Also evident is the fact that the denial or revocation of a license by the Board, even if *predicated* on a criminal act, is not "issued preliminary to or as a result of a criminal proceeding." This is because the Board's authority under the resolution is civil, not criminal. *See* Ohio Rev. Code § 503.51-59, the enabling statute that permits townships to regulate adult cabarets.

The dissenting opinion embraces Deja Vu's argument and insists that the majority's "analysis is fundamentally misguided . . . because Ohio law does not provide for any judicial review whatsoever for a substantial number of adverse licensing decisions." Dissenting Op. at 18. But the dissent is unable to cite any authority to support its broad interpretation of the exclusionary effect of Ohio Revised Code § 2506.01, nor are we aware of any adverse licensing decisions by the Board that have been denied judicial review in the Ohio Court of Common Pleas because the Board's decision was deemed to have been "issued preliminary to or as a result of a criminal proceeding."

The Supreme Court instructs us that "every reasonable construction must be resorted to, in order to save a [legislative act] from unconstitutionality." *Hooper v. California*, 155 U.S. 648, 657 (1895). Thus, "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, we are obligated to construe the statute to avoid such problems." *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) (citation and quotation marks omitted). This case presents such a situation. Absent any interpretation of § 2506.01 by the Ohio courts to the contrary, we must interpret the resolution in a manner that saves its constitutionality—that is, by concluding that Ohio Revised Code § 2506.01 permits an appeal from an adverse licensing decision by the Board whether or not the decision is predicated upon a criminal act.

### 3.     *Prompt judicial decision*

Deja Vu further maintains that the resolution's provision for the issuance of a temporary license pending appeal of an adverse licensing determination does not provide for the "prompt judicial decision" that is required when the government imposes a prior restraint on the freedom of expression. *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County*, 274 F.3d 377, 403 n.8 (6th Cir. 2001) ("Merely preserving the status quo, however, is not sufficient . . . . The decision whether or not to grant a license must still be made within a specified, brief period, and the licensing scheme 'must *assure* a prompt judicial decision.'") (quoting *Freedman v. Maryland*, 380 U.S. 51, 59 (1965)) (emphasis in original).

The Supreme Court in *Freedman* held that three procedural safeguards are required in order to ensure that a prior restraint on the freedom of expression is constitutional. First, "[a]ny restraint imposed in advance of a final judicial determination on the merits must . . . be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution." 380 U.S. at 59. Second, "the procedure must also assure a prompt final judicial decision." *Id*. And third, the burden of proving that the expression in question is unprotected must rest on the government. *Id*. at 58.

The Sixth Circuit has held that "[l]icensing schemes in a city ordinance regulating sexually oriented businesses constitute a prior restraint that must incorporate at least the first two *Freedman* procedural safeguards." *Deja Vu of Nashville, Inc.*, 274 F.3d at 400-01 (holding that a Nashville ordinance regulating the licensing of sexually oriented businesses did not provide for a prompt judicial determination because it required "aggrieved applicants [to] proceed to court via a discretionary route" instead of allowing for an appeal as of right); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 228 (1990) (plurality opinion of O'Connor, J.) (stating that "the first two [*Freedman*] safeguards are essential: the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained, and there must be the possibility of prompt judicial review in the event that the license is erroneously denied"). In analyzing the constitutionality of an adult-business-licensing scheme, this court has recognized that "any system of prior restraint carries a heavy presumption against its validity." *Deja Vu of Nashville, Inc.*, 274 F.3d at 391.

Deja Vu maintains that the resolution in question fails to provide for prompt judicial review because it does not mandate specific time limits within which the Ohio courts must complete their review of an adverse licensing determination. This issue of what procedures are necessary in the context of an adult-business-licensing scheme to "assure prompt judicial review of an administrative decision denying a license" was recently explored by the Supreme Court in *City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 124 S.Ct. 2219, 2221 (2004). The city ordinance at issue in *Littleton* required "an applicant to provide certain basic information about the business," directed that a license be denied if an applicant had "been convicted of certain crimes within the prior five years," required the city to issue a decision within "about 40 days," and permitted the city's decision to be "appealed to the [state] district court." *Id.* at 2222, 2225 (alteration in original). After concluding that the "First Amendment does not require special 'adult business' judicial review rules," the Court accepted the city's invitation to modify *FW/PBS* by withdrawing its implication that *Freedman*'s special judicial review rules apply to adult-business-licensing schemes. *Id.* at 2224 (finding that "Colorado's ordinary 'judicial review' rules offer adequate assurance, not only that *access* to the courts can be promptly obtained, but also that a judicial *decision* will be promptly forthcoming") (emphases in original).

The Supreme Court was faced with a statute in *Freedman* that prohibited the exhibition of any film until it was approved by a state censorship board, and the board's denial of a license would, "without any judicial participation, effectively bar[] exhibition of any disapproved film, unless and until the exhibitor undert[ook] a time-consuming appeal to the Maryland courts and succeed[ed] in having the Board's decision reversed." *Freedman*, 380 U.S. at 54-55. As the Supreme Court explained in *Littleton*, the special characteristics of the statute before the court in *Freedman* necessitated that strict time limits be placed on judicial review in order to prevent "undue delay resulting in the unconstitutional suppression of protected speech." *Littleton*, 124 S.Ct. at 2225 (observing that the statute in *Freedman* created "a scheme with rather subjective standards and where a denial likely meant complete censorship") (quoting *FW/PBS*, 493 U.S. at 228); *see also Freedman*, 380 U.S. at 61 (finding "that films differ from other forms of expression," and warning "that the nature of the motion picture industry may suggest different time limits for a judicial determination").

In contrast, the adult-business-licensing ordinance before the court in *Littleton* did "not seek to *censor* material" and applied "reasonably objective, nondiscretionary criteria." 124 S.Ct. at 2225 (emphasis in original). Finding that an "adult business licensing scheme does not present the grave dangers of a censorship system," the court concluded that "ordinary court procedural rules and practices, in Colorado as elsewhere, provide reviewing courts with judicial tools sufficient to avoid delay-related First Amendment harm." *Id.* at 2224-26 (quotation marks omitted).

Like the ordinance in *Littleton*, the adult-cabaret-licensing resolution challenged by Deja Vu "applies reasonably objective, nondiscretionary criteria." *Id.* at 2225. The resolution states that the Board "shall approve the application" for an adult cabaret license unless the application is false or incomplete, the applicant is under the age of 18, the operation of the cabaret would violate existing zoning laws, the applicant has committed certain civil offenses within the last three years, or the applicant is a business entity that is not registered to do business in Ohio. Resolution No. 00-22 § (F)(2)(a)-(g). Given that "[t]hese objective criteria are simple enough to apply and their application simple enough to review," and that Deja Vu has given us "no reason to doubt the willingness of [Ohio]'s judges to exercise the[ir] powers wisely so as to avoid serious threats of delay-induced First Amendment harm," we conclude that the resolution fulfills *Littleton*'s requirements for prompt judicial review. *Littleton*, 124 S.Ct. at 2225.

The resolution in the present case also provides for an additional First Amendment safeguard not contained in the ordinance that was upheld by the court in *Littleton*— the issuance of a temporary permit. Upon request, the Union Township Board must issue the applicant a temporary permit that will allow the operation of the adult cabaret "until such time as the appeal process . . . has been completed." Resolution No. 00-22 § (J)(1). The inclusion of this provision may well have been prompted by this court's decisions suggesting that cities could avoid constitutional infirmities in their adult-business-licensing schemes by issuing "provisional licenses" that "actually permit the communication of protected expression until a judicial decision is rendered." *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 894 (6th Cir. 2000) (invalidating an adult-cabaret-licensing scheme because it did not include such a provision); *see also Currence v. City of Cincinnati*, Nos. 00-3985/4041, 2002 WL 104778, at *7 (6th Cir. Jan. 24, 2002) (per curiam) (unpublished) (noting that our decisions have "suggested that a city enact an ordinance that: 1) requires a license to issue if the court does not decide the issue within a certain period of time; or 2) issues a provisional license to businesses or employees who seek judicial review").

Temporary permits are one way to comply with *Freedman*'s requirement that "[a]ny restraint imposed in advance of a final judicial determination on the merits must . . . be limited to the preservation of the status quo." *Freedman*, 380 U.S. at 59; *see also Deja Vu of Nashville, Inc.*, 274 F.3d at 403 n.8 (finding that *Freedman*'s requirement of "preserving the status quo" could be met by the issuance of temporary licenses that would allow "existing businesses to continue to operate until an adjudication on the merits" of their appeals).

Although the resolution under consideration in this case provides for temporary licenses to be issued while an appeal is pending, Deja Vu nevertheless maintains that the resolution fails to preserve the status quo. In support of its argument, Deja Vu points to the provision that requires an applicant operating under a temporary permit "to follow all other guidelines set forth in [the] resolution." Resolution No. 00-22 § (J)(1). We read this section as requiring Deja Vu to adhere to the regulations governing duly licensed cabarets, such as complying with the hours-of-operation provision or maintaining a list of employees with the Union Township Clerk.

Deja Vu is therefore correct that possession of a temporary license does not permit an adult cabaret to operate without any governmental regulation. Compliance with the resolution's minimal requirements, however, falls far short of the kind of "complete censorship" that prompted the Supreme Court in *Freedman* to fashion the status quo requirement. *Littleton*, 124 S.Ct. at 2225.

An adverse decision by the censorship board in that case would have barred the film from being shown during the pendency of the lengthy appeal. Here, Deja Vu may still operate as an adult cabaret even though it must close earlier than it would like. Such a regulation "is unlikely in practice to suppress totally" Deja Vu's protected expression. *Id.* (upholding the adult-business-licensing ordinance even though it did not provide for temporary licences because "[s]ome license applicants will satisfy the criteria even if others do not; hence the community will likely contain outlets that sell protected adult material"). We therefore conclude that, in providing for temporary permits, the resolution effectively preserves the status quo while appeals from the Board's adverse licensing decisions are pending.

## C.      Hours of operation

Deja Vu's next contention is that the hours-of-operation provision in the resolution violates the First Amendment. The district court denied Deja Vu a preliminary injunction on this issue after finding that the hours-of-operation provision "furthers an important or substantial interest in the protection of public safety," and that it "is reasonable and no more repressive of protected speech than is essential to serve Defendants' legitimate interests." In so ruling, the district court emphasized that Deja Vu is still allowed to operate for 84 hours each week.

To analyze Deja Vu's claim, we must first determine what level of scrutiny to apply to the resolution. We are guided by the Supreme Court's decision in *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000), in which the Court held that "government restrictions on public nudity . . . should be evaluated under the framework set forth in [*United States v.*] *O'Brien* [391 U.S. 367 (1968),] for content-neutral restrictions on symbolic speech." *City of Erie*, 529 U.S. at 289, 293 (applying "the 'less stringent' standard from *O'Brien*" that is normally reserved for content-neutral regulations because the "State's interest in preventing harmful secondary effects is not related to the suppression of expression"). Under the four-part test outlined in *O'Brien*, "a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377.

The resolution's hours-of-operation provision will pass muster under *O'Brien* so long as it imposes only "reasonable time, place or manner restrictions" on protected speech. *See Clark v. Cmty for Creative Non-Violence*, 468 U.S. 288, 293, 298 (1984) (noting that the "four-factor standard of [*O'Brien*] for validating a regulation of expressive conduct . . . is little, if any, different from the standard applied to time, place, or manner restrictions"); *see also Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435, 440 (6th Cir. 1998) ("*Richland Bookmart I*") (analyzing a similar hours-of-operation provision "as a form of time, place and manner regulation"). To be valid, however, the resolution's hours-of-operation provision must (1) "serve a significant government interest," (2) be "narrowly tailored" to that purpose, and (3) "leave open ample alternative channels for communication of the information." *Clark*, 468 U.S. at 293.

Deja Vu contends that the hours-of-operation provision, which requires that adult cabarets close at midnight, does not serve a substantial governmental interest because there is no evidence that additional operating hours would lead to negative secondary effects. A similar argument was considered by this court in *Richland Bookmart I*, 137 F.3d 435, in which an adult bookstore challenged a statute regulating the operating hours of adult-oriented establishments. Like the resolution in this case, the statute in *Richland Bookmart I* had been enacted for the express purpose of minimizing the adverse secondary effects of sexually oriented businesses. The court found that "[r]educing crime, open sex and solicitation of sex and preserving the aesthetic and commercial character of the neighborhoods surrounding adult establishments is a substantial government interest . . . . It is not unreasonable to believe that such regulation of hours of shops selling sex literature

would tend to deter prostitution" and other negative secondary effects. *Id.* at 440 (quotation marks omitted).

For the same reasons, we reject Deja Vu's argument that the hours-of-operation provision does not further Union Township's substantial interest in protecting "the public health, safety and welfare." Union Township's decision to regulate the hours of operation was based upon studies of the adverse secondary effects of adult cabarets and other sexually oriented businesses. Resolution No. 00-22 §§ B & C. As the Supreme Court has recognized, "[t]he asserted interests of . . . combating the harmful secondary effects associated with nude dancing are undeniably important," and such "regulation furthers the government interest . . . since crime and other public health and safety problems are caused by the presence of nude dancing establishments . . . ." *City of Erie*, 529 U.S. at 296, 300.

Deja Vu contends, in the alternative, that the hours-of-operation provision is not narrowly tailored and that the resulting burden on protected First Amendment expression is greater than necessary to further Union Township's interest in minimizing the secondary effects of adult cabarets. In support of its position, Deja Vu points to the fact that the resolution permits adult cabarets that serve alcohol to stay open until 2:30 a.m., while those cabarets not serving alcohol are prohibited from being open past midnight. Resolution No. 00-22 § (L)(1) (requiring an adult cabaret to close at the later of midnight or the closing time required under its liquor permit). Because Deja Vu is an adult cabaret that does not sell alcoholic beverages, it can operate only until midnight. Deja Vu claims that such disparate treatment is unjustified, and points to the decisions of numerous courts that have concluded that sexually oriented businesses that serve alcohol actually present an *increased* risk of adverse secondary effects. *See, e.g.*, *New York State Liquor Auth. v. Bellanca*, 452 U.S. 714, 718 (1981) ("Common sense indicates that any form of nudity coupled with alcohol in a public place begets undesirable behavior.").

That the resolution results in disparate treatment, however, does not necessarily raise First Amendment concerns. If there were no reasonable explanation for the resolution's distinction between the two types of cabarets, the inference could be drawn that Union Township was acting with some invidious motive in passing the resolution. But this is not the case here, where Union Township can point to at least two plausible justifications for the different closing times. The first is that Union Township wanted to institute a midnight closing time for all adult cabarets, but was prevented from doing so by conflicting state liquor laws. Second, in enacting the resolution, Union Township relied upon research suggesting that the patrons of alcohol-free adult cabarets are often more unruly because these cabarets are frequently patronized later in the evening by customers who have become intoxicated at other establishments. Although Union Township could have elected to permit all adult cabarets to close at 2:30 a.m., thereby accommodating state liquor laws and eliminating the disparate treatment concerns, the First Amendment does not require Union Township to make this choice. *See Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989) (holding that although "a regulation of the time, place, or manner of protected speech must be narrowly tailored[,] . . . it need not be the least restrictive or least intrusive means of doing so").

The dissenting opinion, however, notes that "the Township has cited no research whatsoever" in enacting the resolution. Admittedly, Union Township did not commission its own in-depth study, but "[t]he First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 50-52 (1986).

As stated in the preamble to the resolution, Union Township relied upon studies from 12 different cities in determining that enactment of the resolution would curtail unwanted secondary

effects associated with adult cabarets, including increased crime. Union Township Administrator Kenneth Geis further attested that documented instances of intoxicated patrons engaging in "serious criminal activity in [a] cabaret" prior to the enactment of the resolution also led Union Township to conclude that tighter regulation of the hours of operation of adult cabarets would likely decrease criminal activity in the cabarets and surrounding neighborhoods. This evidence can be said to "fairly support [Union Township]'s rationale for its ordinance" and therefore meets the requirements of the narrow-tailoring test. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438-439 (2002) (rejecting a First Amendment challenge to a zoning ordinance because the adult-business plaintiffs failed to "demonstrat[e] that the municipality's evidence does not support its rationale or . . . furnish[] evidence that disputes the municipality's factual findings").

The resolution's hours-of-operation provision also "leave[s] open ample alternative channels for communication" of Deja Vu's protected expression. *See Clark*, 468 U.S. at 293. In *Richland Bookmart I*, this court found that "[a]ccess to adult establishments [wa]s not unduly restricted" by legislation that required adult businesses to close at midnight. 137 F.3d at 441 (upholding the closing law because adult businesses could "still be open many hours during the week"). We similarly conclude that the resolution's hours-of-operation provision, which permits Deja Vu to be open for twelve hours a day, six days a week, passes First Amendment muster. *See Ctr. for Fair Pub. Policy v. Maricopa County*, 336 F.3d 1153, 1159 (9th Cir. 2003) (noting, in upholding a restriction on the operating hours of adult businesses, that "six other circuits have had occasion to consider similar restrictions, and all have found such restrictions to be constitutional").

In addition to its First Amendment challenge to the hours-of-operation provision, Deja Vu also argues that the resolution in question violates the Equal Protection Clause because it applies to the hours of operation of sexually oriented businesses that offer live entertainment but not to those that offer only pictorial representations. These other "sexually oriented businesses," such as adult bookstores and theaters, are allowed to stay open until 2:30 a.m. pursuant to a different Union Township resolution.

An analogous argument was addressed by this court in *Richland Bookmart, Inc. v. Nichols*, 278 F.3d 570, 572 (6th Cir. 2002) ("*Richland Bookmart II*"), where legislation limited the operating hours of adult businesses, but made an exception for those businesses offering "only live, stage adult entertainment in a theater, adult cabaret, or dinner show type setting." The court found that the legislation was subject to the relaxed standard of rational-basis scrutiny "[b]ecause adult-bookstore owners are obviously not a suspect class entitled to heightened protection," and because an otherwise valid hours-of-operation restriction does not "implicate any fundamental right." *Id.* at 574.

Deja Vu does not seriously dispute that the resolution's hours-of-operation provision is subject to rational-basis review. Rather, it contends that the provision's distinction between live and nonlive entertainment is irrational. The fact that the resolution's hours-of-operation provision contains an exception for establishments offering nonlive entertainment, however, is not a cause for concern under rational-basis review because a government "may implement its program of reform by gradually adopting regulations that only partially ameliorate a perceived evil." *Id.* at 577 (citation omitted); *see also Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955) (finding that "the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind . . . and apply a remedy there, neglecting the others" without violating the Equal Protection Clause). Because the hours-of-operation provision furthers a substantial government interest, as discussed above, and because there is no evidence of an impermissible motive on the part of Union Township, the resolution withstands Deja Vu's Equal-Protection challenge. *See Richland Bookmart II*, 278 F.3d at 576 (stating that "an exemption will rarely, if ever, invalidate a statute, unless the distinction created by the exemption is the result of invidious discrimination").

Deja Vu further argues, however, that the resolution violates the Equal Protection Clause because adult cabarets that do not have a liquor license are required to close at midnight, while adult cabarets that serve alcohol are permitted to remain open until the 2:30 a.m. closing time provided under their state liquor licenses. The dissenting opinion accepts this argument and proposes as a solution the more speech-restrictive alternative of "requir[ing] *all* cabarets to cease nude dancing at midnight." Dissenting Op. at 21 (emphasis in original). But because there is no evidence that Union Township enacted the resolution with an impermissible motive, and because Union Township may act incrementally to alleviate the harmful secondary effects of adult cabarets, we reject this Equal Protection challenge to the resolution's hours-of-operation provision.

## D.     Disclosure of personal information

Deja Vu also claims that the resolution violates the First Amendment by requiring an applicant for an adult-cabaret license to furnish the Board with certain personal information. An applicant must provide his or her "full name, residence address and date of birth," Resolution No. 00-22 § (D)(5)(c), and an "[a]uthorization for an investigation into the background, including any criminal record, of the applicant and any person or entity named in the application . . . ." *Id*. at (D)(5)(g). In addition, "a list of employees" must be filed by a licensee that states "the name, date of birth, and position of each employee." *Id*. at (M)(3). Deja Vu maintains that requiring the disclosure of this information "as a prerequisite for being able to engage in First Amendment protected activities" is unconstitutional.

The district court applied the four-part test outlined in *United States v. O'Brien*, 391 U.S. 367 (1968), to evaluate whether the information-disclosure provisions were permissible. After concluding that the above-mentioned disclosure requirements were sufficiently related to the legitimate governmental interests supporting the resolution and were not impermissibly broad, the district court upheld the provision. The district court did, however, strike down as impermissibly broad the portions of Resolution No. 99-15 that required the disclosure of personal information related to every partner or shareholder of an applicant. As amended, the resolution no longer contains these disclosure provisions and neither Union Township nor the Attorney General has appealed the district court's holding on this issue. The amended resolution also omits the provision that required an applicant to disclose the residential address and social security number of each adult-cabaret employee. Resolution No. 99-15 § (D)(5)(f). As noted above, however, the resolution still requires a *licensee* to maintain a list of employees with the Clerk, including "the name, date of birth, and position of each employee." Resolution No. 00-22 § (M)(3).

On appeal, Deja Vu contends that the collection of personal information from an adult-cabaret applicant does not further a substantial governmental interest. This court has declared, however, that disclosure provisions even broader than those contained in Resolution No. 00-22 § (D) further a substantial governmental interest in minimizing the secondary effects of sexually oriented businesses. *See Deja Vu of Nashville, Inc.*, 274 F.3d at 393 (holding that an ordinance requiring applicants to "divulge such personal information as full name, height, weight, hair color, eye color, date of birth, current residential address, and all residential addresses for the prior three years" furthers Nashville's "substantial governmental interest in eradicating the secondary effects of sexually oriented businesses"). This argument by Deja Vu is therefore without merit.

Deja Vu further maintains that the personal information gathered is not narrowly tailored to achieve Union Township's purported interest in promoting the general health, safety, and welfare of its citizens. In support of this argument, Deja Vu cites *Schultz v. City of Cumberland*, 228 F.3d 831, 852 (7th Cir. 2000), in which the Seventh Circuit invalidated a provision requiring an applicant to disclose his or her residential address, concluding that such information "is not narrowly tailored to the government's interest in the time, place or manner of adult entertainment." Deja Vu also claims that the collection of personal information creates a substantial danger because, pursuant to

Ohio's Public Records Act, Ohio Revised Code § 149.43(A)(1) and (B), such disclosures would be considered to be public records. Given that public records can be reviewed by anyone, Deja Vu contends that the personal safety of individuals applying for an adult cabaret license might be jeopardized.

This tension between the legitimate governmental need for such information and the reasonable concerns of adult-cabaret licensees for their personal safety was resolved by this court in *Deja Vu of Nashville, Inc.*, 274 F.3d at 394. The court upheld the Nashville ordinance's required disclosures, but only after concluding that *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1064-65 (6th Cir. 1998), prohibits public release of the applicants' names and current and past residential addresses. *Deja Vu of Nashville, Inc.*, 274 F.3d at 394. Like the plaintiffs in *Deja Vu of Nashville, Inc.*, the plaintiffs in the present case have presented "significant evidence that the requirement that applicants submit their names and . . . addresses to a public forum poses serious risks to their personal security." *Id.* We therefore conclude that the resolution's disclosure provisions are constitutional, but that the names and other information that are gathered pursuant to those provisions constitute protected private information that are exempted from Ohio's Public Records Act. *See* Ohio Rev. Code § 149.43; *see also Deja Vu of Nashville, Inc.*, 274 F.3d at 395 (holding that "all sexually oriented business license and permit applicants' names and current and past residential addresses constitute protected private information and are therefore exempted from Tennessee's Open Records Act").

## E.      Civil disability

Deja Vu also claims that the civil-disability provisions included in the resolution violate the First Amendment. The current resolution states that an application will be denied if "[t]he applicant or any person named in the application for an initial or renewal permit to operate an adult cabaret" has been convicted of or pled guilty to (1) a violation of Ohio Revised Code § 503.53(C) within the past five years, or (2) a sex offense covered by Ohio Revised Code § 2907 within the past three years. Resolution No. 00-22 § (F)(2)(e) and (f).

Ohio Revised Code § 503.53(C) prohibits certain sexual conduct from taking place within an adult cabaret, including restrictions on the display or touching of the entertainers' breasts, buttocks, or genitals. Along with sexual assaults and prostitution, Ohio Revised Code §§ 2907.02-.34 also prohibit public indecency, disseminating matter harmful to juveniles, pandering obscenity, and compelling the acceptance of objectionable materials. Because the civil-disability provisions implicate the behavior of "[t]he applicant or any person named in the application," Deja Vu claims that the ability to operate an adult cabaret is conditioned on the criminal record of not only the applicant, but also on the record of the owners, partners, and employees of the business.

In evaluating whether the civil-disability provisions are permissible, the district court applied the four-part test outlined in *United States v. O'Brien*, 391 U.S. 367 (1968). The district court focused on (1) whether the civil disabilities actually further the asserted governmental interest, and (2) whether the burden imposed by the provisions is greater than necessary to accomplish its purpose. Union Township relied upon two studies that specifically focused on the adverse secondary effects of adult cabarets. After reviewing these studies, the district court concluded that the civil-disability provisions "further[] an important or substantial interest in the protection of public safety." The district court then decided that the civil-disability provisions do not "unduly restrict the right of persons in Union Township to express an erotic message and leaves available the alternative avenue of expression." (citing *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 587 (1991)).

On appeal, the defendants contend that Deja Vu does not have standing to challenge the civil-disability provisions because "it has not yet applied for a permit and there is no allegation that

the person or entity applying for the permit is subject to either of the[] disability provisions." To have constitutional standing necessary to maintain a lawsuit, "(1) a plaintiff must have suffered some actual or threatened injury due to the alleged illegal conduct of the defendant; (2) the injury must be 'fairly traceable' to the challenged action; and (3) there must be a substantial likelihood that the relief requested will redress or prevent the plaintiff's injury." *Deja Vu of Nashville, Inc.*, 274 F.3d at 389.

Deja Vu claims that it has standing on this issue because Jane Roe II, a female dancer who performs at Deja Vu, was "convicted in April 1997 of an offense substantially equivalent to Ohio Revised Code [§] 2907 (obscenity and various sexual offenses)." After the district court issued its decision, however, the original resolution was amended so that the employment restrictions now apply only to those individuals who have committed § 2907 sex offenses within the last three years. Resolution No. 00-22 § (F)(2)(e). Jane Roe II's 1997 conviction is thus insufficient to give Deja Vu standing to challenge the civil-disability provisions. For the same reason, neither the 1989 obscenity conviction of John Doe I, who has a two-percent ownership interest in Deja Vu, nor the 1992 obscenity conviction of John Doe II, who is employed by Deja Vu as a disc jockey, is sufficient to establish Article III standing for Deja Vu.

Moreover, Union Township points out that the resolution no longer requires the disclosure of employees in the application or provides for the revocation of a license based upon prior criminal convictions of employees. The original resolution provided that "[a]n application for an initial permit to operate an adult cabaret shall contain . . . [t]he full name, residence address, date of birth, and social security number of each person employed by the adult cabaret . . . ." Resolution No. 99-15 § (D)(5)(f). This requirement was eliminated, however, from the new resolution. Resolution 00-22 § (D). Although, as noted above, the resolution still requires a *licensee* to maintain a list of employees with the Clerk, Resolution No. 00-22 § (M)(3), employees are no longer "named in the application for an initial or renewal permit to operate an adult cabaret." *Id.* § (F)(2)(e)-(f). As a result, the civil-disability provisions do not apply to employees. The criminal record of Jane Roe II or any other employee is therefore insufficient to subject Deja Vu to a permit denial or revocation based on the civil-disability provisions. Deja Vu has thus not alleged sufficient injury in fact to establish Article III standing on this issue.

We recognize that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). In the present case, however, Union Township eliminated the challenged provisions even though the district court held that there was a substantial likelihood that the provisions were in fact *valid*. This is in contrast to the more typical situation presented by *Deja Vu of Nashville, Inc.*, in which the municipality amended its ordinance only after certain provisions were voided by the district court, and where the municipality "repeatedly expressed its intention to reenact those portions of the Ordinance judged unconstitutional . . . at the earliest opportunity." 274 F.3d at 387. Under those circumstances, this court held that the amendments did not moot the issues on appeal. *Id.*

In the present case, the civil-disability provisions in question were not held unconstitutional by the district court, and Union Township has not announced an intention to reenact those provisions if the issue is dismissed as moot. The principle announced in *Mesquite* is therefore inapplicable. *See Ky. Right to Life, Inc. v. Terry*, 108 F.3d 637, 645 (6th Cir. 1997) (concluding that "the City's announced intention to reenact the unconstitutional ordinance if the case was dismissed as moot" was "[c]ritical to the Court's decision" in *Mesquite*).

Deja Vu still contends, however, that the civil-disability provisions are unconstitutional because "the rapid turnover of entertainers and others in this industry insures that this issue is capable of repetition, yet evading review . . . ." *See Int'l Org. of Masters, Mates & Pilots v. Brown*,

498 U.S. 466, 473 (1991). This argument focuses on the transient nature of *employment* by adult cabarets. But, as noted above, the resolution no longer requires the disclosure of employees in the application or provides for the revocation of a license based upon any prior criminal convictions of employees. The fact that Jane Roe II committed a sex crime more than three years ago is thus irrelevant to the determination of whether Deja Vu has standing.

For all of the above reasons, we conclude that Deja Vu does not have standing to challenge the resolution's civil-disability provisions.

## F.     Health and safety inspections

After concluding that Deja Vu was likely to establish that the warrantless health-and-safety-inspection provisions contained in §§ (L)(1) and (M)(2) of Resolution No. 99-15 violated the Fourth Amendment, the district court enjoined Union Township from enforcing those provisions. Resolution No. 99-15 § (L)(1) provided that "Township personnel or agents may at all reasonable times inspect permit premises to insure continued compliance with the laws of Ohio and these regulations." Section (M)(2) stated that "[t]he owner, operator, or person in charge of the adult cabaret shall allow state or local authorities, including law enforcement officers, access to any and all parts of the premises for the purpose of making any health or safety inspection pursuant to these regulations, and shall cooperate in any background investigation."

Union Township amended the resolution in response to the district court's ruling that Deja Vu was likely to prevail in its argument that the warrantless health and safety inspections violate the Fourth Amendment. The current resolution no longer contains those provisions, and Union Township has not appealed the district court's order enjoining it from performing health and safety inspections. Ohio's Attorney General, however, has filed a cross-appeal in the present case, asking us to reverse the district court's injunction on this ground. But the Attorney General's ability to seek appellate review of this issue, when neither Union Township nor Deja Vu has appealed from the district court's decision, is limited by his status as an intervenor. The controlling statute is 28 U.S.C. § 2403(b), which provides in pertinent part as follows:

> In any action, suit, or proceeding in a court of the United States to which a State . . . is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court . . . shall permit the State to intervene for presentation of evidence . . . and for argument on the question of constitutionality. The State shall, subject to the applicable provisions of law, have all the rights of a party . . . to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality.

The Ohio Attorney General was permitted to intervene in the present suit in order to defend the constitutionality of Ohio's enabling statute, Ohio Revised Code §§ 503.51-59. This is the statute that permits townships to pass local ordinances regulating the operations of adult cabarets within their borders. In finding that the warrantless health and safety inspections provided for by the Union Township resolution were violative of the Fourth Amendment, the district court made no ruling with respect to the constitutionality of the Ohio enabling statute. *See Int'l Paper Co. v. Inhabitants of the Town of Jay*, 887 F.2d 338, 342 (1st Cir. 1989) ("[T]he relevant authority as well as the statutory language indicate that a local ordinance is not a statute within section 2403(b), and we are not aware of any substantial support for [a] broader interpretation.").

Absent from the district court's discussion is any mention whatsoever of Ohio Revised Code §§ 503.53 or 503.56, the sections of the enabling statute that permit townships to conduct health and safety inspections of adult cabarets. The district court concluded that the Union Township resolution was likely to be unconstitutional because the resolution required adult cabarets to submit

to warrantless inspections "at all reasonable times." Resolution No. 99-15 § (L)(1). Because it failed to define "reasonable," the district court found that the Union Township resolution "vest[ed] unfettered discretion in township officials." Ohio's enabling statute, in contrast, contains no such language, and instead simply requires that adult cabarets "[u]ndergo periodic health and safety inspections to determine continual compliance with applicable health and safety codes." Although it enjoined the enforcement of the Union Township resolution, the district court left open the possibility that a township might enact a local resolution pursuant to the Ohio enabling statute that was in fact constitutional.

Because neither Union Township nor Deja Vu has raised this issue on appeal, and because the constitutionality of the Ohio enabling statute is not at issue, we decline to review the district court's grant of a preliminary injunction against the enforcement of the health-and-safety-inspection provisions of now-repealed Union Township Resolution No. 99-15. *See Blair v. Shanahan*, 38 F.3d 1514, 1522 (9th Cir. 1994) (holding that "28 U.S.C. § 2403(b) does not allow a State standing to participate in a motion where questions of constitutionality [of a state statute] are not among the issues argued"); *see also Ruotolo v. Ruotolo*, 572 F.2d 336, 339 (1st Cir. 1978) ("There is . . . a difference between permitting the [§ 2403 intervenor] to play an active role during the pendency of private litigation, and permitting it to go forward with the litigation in its own right after the private parties have composed their differences.").

Even though we express no opinion on the constitutionality of the warrantless health and safety inspections, the district court's temporary injunction remains in effect, and we find nothing in the record to indicate that Union Township will attempt to reenact the provisions already deemed offensive to the Fourth Amendment. If the district court should abruptly change course on remand and fail to permanently enjoin Union Township from conducting the warrantless health and safety inspections, that determination would of course be reviewable by this court on appeal from a final judgment below.

## G.    Vagueness

Deja Vu finally claims that several of the resolution's provisions are unconstitutionally vague. Specifically, Deja Vu complains that the resolution completely fails to define the phrases "adequate supervision" in § (M)(4) or "reasonable cause" in § (L), and fails to adequately define the terms "employee" in § (A)(3), "touching" in § (N)(4)(b), or "uncover" in § (N)(4)(c).

"[A]n enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (holding that Rockford's antinoise ordinance was not unconstitutionally vague). Vague laws are problematic because they (1) "may trap the innocent by not providing fair warning," (2) fail to "provide explicit standards for those who apply them," and (3) threaten "to inhibit the exercise of [First Amendment] freedoms." *Id*. at 108-09 (quotation marks and footnote omitted). A law must therefore "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id*. at 108.

The Supreme Court has explained that, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Id*. at 110. With this point in mind, we are of the opinion that, although the specific terms may not be defined with "meticulous specificity, . . . it is clear what the ordinance as a whole prohibits." *Id*. (citation and quotation marks omitted). Each of the terms challenged by Deja Vu is commonly used in both legal and common parlance, and is thus sufficiently clear so that a reasonable person can understand its meaning. We therefore conclude that the challenged terms are not unconstitutionally vague.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the district court's decision to deny in part the preliminary injunction, express **NO OPINION** on the district court's decision to grant in part the preliminary injunction in light of Union Township's subsequent modification of the resolution, and **REMAND** the case for further proceedings consistent with this opinion.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

CLAY, Circuit Judge, with whom Judges DAUGHTREY and COLE join, concurring in part and dissenting in part. I concur in Parts II.D (Disclosure of personal information), II.E (Civil disability), II.F. (Health and safety inspections), and II.G (Vagueness) of the majority opinion. For the reasons that follow, however, I dissent with respect to Parts II.B (Prompt judicial review) and Part II.C (Hours of operation).

**I.**
**RIGHT TO PROMPT JUDICIAL REVIEW**
**OF ADVERSE LICENSING DECISION**

Deja Vu argues that Resolution No. 00-22 creates an unlawful prior restraint on its First Amendment right to free speech because it fails to provide for prompt judicial review of an adverse decision by the Union Township Board of Trustees ("Board" or "Township") to refuse to grant or renew, or to revoke, a permit to operate an adult cabaret. The majority rejects this argument, reasoning that not only does Ohio law provide for the same type of judicial review mechanism that the Supreme Court endorsed in *City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 124 S. Ct. 2221 (2004), but also that the Resolution provides an additional First Amendment safeguard by requiring the issuance of a temporary permit pending judicial review. The majority's analysis is fundamentally misguided, however, because Ohio law does not provide any judicial review whatsoever for a substantial number of adverse licensing decisions.

Resolution No. 00-22 § (C) prohibits any person from engaging in, conducting, or carrying on an adult cabaret "without a valid, current permit" issued pursuant to the Resolution's regulations. Resolution No. 00-22 § (A)(1) defines an "adult cabaret" to mean an establishment "in which persons appear in a state of nudity in the performance of their duties," and Section (N)(4) prohibits an employee of an adult cabaret, "in the performance of his or her duties," from touching or fondling certain specified anatomical areas of his or her body or on any other person. The Resolution's preamble acknowledges that adult cabarets may engage in "activities protected by the First Amendment." Resolution No. 00-22, Preamble at ¶ E; *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (holding that nude erotic dancing is constitutionally-protected, even though it "falls only within the outer ambit of the First Amendment's protection"); *Schultz v. City of Cumberland*, 228 F.3d 831, 836, 843 (7th Cir. 2000) (holding that the term "performances" in a city ordinance that regulated "live performances which are characterized by the exposure of 'specified anatomical areas' or 'specified sexual activities'… undeniably denotes communicative content and applies explicitly to expression, not mere conduct"). Consequently, Union Township's licensing scheme is a classic "prior restraint" on constitutionally protected expression because the Resolution gives "public officials the power to deny use of a forum in advance of actual expression." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).

Any system of prior restraint comes to this Court "bearing a heavy presumption against its constitutional validity." *Id.* at 558 (internal quotation marks and citations omitted). "The presumption against prior restraints is heavier – and the degree of protection broader – than that against limits on expression imposed by criminal penalties." *Id.* at 558-59. Thus,"[t]he settled rule is that a system of prior restraint 'avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system.'" *Id.* at 559 (quoting *Freedman v. Maryland*, 380 U.S. 51, 58 (1965); other citations omitted). Among those required safeguards is that the censor must assure "a prompt final judicial determination" of the propriety of restraining the expression. *Id.* at 560 (following *Freedman*). The purpose of this safeguard is to

provide review of a censorship decision by an independent branch of government, which may be more responsive to constitutionally protected interests in free expression. *Id.* at 560-61. Union Township's Resolution fails to provide this basic constitutional protection.

Under the Resolution, an individual desiring to operate an adult cabaret must file an application with the Board and authorize an investigation into his or her background, "including any criminal record, of the applicant and any person or entity named in the application, including authorization to conduct subsequent investigations to supplement or update the information." Resolution No 00-22 § (D)(5)(g). Upon receipt of the application, the chief of the Union Township police department conducts the prescribed criminal background check. *Id.* § (E).

After conducting a public hearing, the Board is required to approve the application for a permit, unless, *inter alia*, (1) in the past three years, the applicant or any person named in the application has been convicted of a sex offense under Ohio Revised Code Ch. 2907 (prohibiting rape, sexual battery, unlawful sexual contact with a minor, sexual imposition, importuning, voyeurism, and public indecency); (2) in the past five years, the applicant or any person named in the application has been convicted of an offense under Ohio Revised Code § 503.53(C), which prohibits adult cabaret employees from touching, fondling, massaging, or displaying their own or any other person's genitals, pubic area, buttocks, or (female) breasts; or (3) the applicant has violated the Resolution's regulations, which, among other things, make it unlawful for an adult cabaret to employ a person under age 18 and prohibits the acts criminalized by Ohio Revised Code § 503.53(C). Resolution No. 00-22 §§ (F)(2)(e)-(g) and (N). The Board may revoke a permit after a public hearing "upon discovery of a violation" of the Resolution's regulations. *Id.* § (I).

The Resolution provides that an applicant denied a new permit or a renewal permit or an individual whose permit is revoked by the Board "may appeal the action of the Board in accordance with chapter 2506 of the Ohio Revised Code." Resolution No. 00-22 §§ (J)(1)-(2). Similarly, the Ohio Revised Code provides that "[a]ny person adversely affected by an order of the board denying or revoking a permit to operate an adult cabaret may appeal from the order of the board to the court of common pleas…in accordance with Chapter 2506[ ] of the Revised Code." OHIO REV. CODE ANN. § 503.57. Although Chapter 2506 of the Code authorizes the appeal of a final order, adjudication, or decision of a municipality's board of trustees, it does not permit the appeal of "any order, adjudication, or decision that is issued preliminary to or as a result of a criminal proceeding." OHIO REV. CODE § 2506.01.

As explained below, the Resolution is structured so that the Board may refuse to grant new permits, refuse to renew permits, or revoke current permits based not only on a final criminal conviction for a sex offense (*e.g.*, rape, sexual battery, sexual imposition, voyeurism, public indecency, or touching or displaying one's genitals or buttocks in an adult cabaret), but also on merely the applicant's pending criminal charges for a sex offense or the fact that the applicant is the subject of a criminal investigation for such an offense. Consequently, many, if not most, of the Board's decisions to not renew or revoke permits for adult cabarets are likely to be unreviewable because they are issued "preliminary to or as a result of a criminal proceeding." *Id.*

First, new applicants for an adult cabaret permit must submit to a criminal background check by the Union Township police, and will be denied a permit if found to have pled guilty to, or been convicted of, an offense proscribed by Ohio Revised Code Ch. 2907 or § 503.53(C). Such application denials are the "*result of* a criminal proceeding" under the most common-sense interpretation of those words and, therefore, such denials are unreviewable. OHIO REV. CODE § 2506.01 (emphasis added). Similarly, current permit holders may have their permits revoked should the Board "discover[]" a violation of the Resolution, which includes the aforementioned criminal prohibitions. To the extent the Board revokes a permit as a consequence of a guilty plea

or a conviction for one of these offenses, this decision is unreviewable because it is "issued…*as a result of* a criminal proceeding."  OHIO REV. CODE § 2506.01 (emphasis added).

Second, a license revocation is unreviewable where the Board, working with the Union Township police department and local prosecutors, discovers or becomes aware of a suspected criminal offense for which a conviction has not yet materialized, such as where the permit holder has  been charged with a sex offense or is merely being investigated for such an offense  *See*, *e.g.*, J.A. 114-15 (Affidavit of Union Township Administrator, Kenneth Geis, at ¶ 8) (explaining the Township's concerns undergirding a prior version of the Resolution, and recounting an incident at an adult cabaret where "a dancer and a patron were charged with prostitution and related offenses" and "[a]nother person was charged with abduction, gross sexual imposition and felonious sexual penetration for actions which occurred inside the cabaret").  The Board's decision not to issue or to revoke a permit on the ground that the applicant merely has been charged with, or is suspected of, violating the criminal laws against, for example, sexual imposition, voyeurism, public indecency, or touching or displaying genitals, is unreviewable as a decision issued "*preliminary to*…a criminal proceeding."  *Id.* (emphasis added).  In other words, under the present wording of the Resolution, mere allegations of certain sex offenses may lead to a nonappealable permit revocation.

Try as it might, the majority cannot evade the plain language of § 2506.01 which, as shown above, deprives the Ohio courts of jurisdiction over numerous adverse licensing decisions.  The majority makes much of the fact that there appears to be no published Ohio authority denying judicial review of a licensing decision that was rendered preliminary to or as a result of a criminal proceeding.  Yet, the majority fails to mention that there similarly is no published authority permitting judicial review of such a decision.  Thus, the absence of Ohio authority proves nothing.

Moreover, it is the majority, not the dissent, which is "far-reaching" in ignoring the plain language of § 2506.01 and holding, without any citation to Ohio authority, that the Ohio legislature enacted § 2506.01 in order to prevent criminal defendants from circumventing normal appellate procedures by precluding them from seeking interlocutory appeals in the Ohio Court of Common Pleas. Although the majority is correct that we must resort to every reasonable construction in order to save a legislative act from unconstitutionality, the majority's construction of § 2506.01 is unreasonable because it is divorced from the clear and plain meaning of the statute's words and relies entirely on an invented legislative intent.  Accordingly, the majority has not saved § 2506.01 through an alternative, reasonable construction.  It has completely (and inappropriately) re-written the statute. *See Eubanks v. Wilkinson,* 937 F.2d 1118, 1122 (6th Cir. 1991) ("[T]he general federal rule is that courts do not rewrite statutes to create constitutionality.")

Because the purpose and structure of the Resolution authorizes the Township to revoke or not to renew an adult cabaret's license to operate as a result of an impending or final criminal proceeding, it follows that Ohio Revised Code § 2506.01 is simply not applicable and that Resolution No. 00-22 in reality does not provide for *any* judicial determination of an adverse licensing decision in many cases.  For this reason, and because any system of prior restraint comes to this Court "bearing a heavy presumption against its constitutional validity," *Southeastern Promotions*, 420 U.S. at 558 (internal quotation marks and citations omitted), I would hold that Union Township's licensing scheme amounts to an unconstitutional prior restraint on Deja Vu's protected expression.

## II.
## HOURS OF OPERATION PROVISION

Under the First Amendment, content-neutral restrictions on expressive conduct, such as regulations of nude dancing or adult theaters for their adverse secondary effects, must be "narrowly tailored to serve a significant governmental interest."  *Clark v. Community for Creative Non-*

*Violence*, 468 U.S. 288, 293 (1984); *see also City of Erie*, 529 U.S. at 289-96; *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986). Such restrictions "need not be the least restrictive or least intrusive means" of serving the Township's legitimate content-neutral interest, but the means chosen cannot be "substantially broader than necessary" to achieve that interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 798-800 (1989). By requiring non-alcohol-serving cabarets to close by midnight, but permitting alcohol-serving cabarets to offer nude dancing until 2:30 a.m., the Resolution's means of regulating the undesirable combination of nude dancing and alcohol consumption is substantially broader than necessary because it unnecessarily forecloses a substantial amount of constitutionally-protected expression.[1] Accordingly, the district court abused its discretion[2] in failing to enjoin the Township's enforcement of the hours of operation provision.

Although the Township claims that the hours of operation regulation is "an attempt to close adult cabarets before the bars and taverns in the area close to avoid unruly and intoxicated men from entering during the late night hours," *Defs' Br.* at 30, it fails to adequately explain the disparate treatment accorded adult cabarets that have liquor licenses and those that do not. Because both Ohio law and the Resolution allow adult cabarets that serve alcohol to stay open until 2:30 a.m., there is no reason why the Resolution's greater limitation on the hours of operation of other adult cabarets is necessary to further the Township's interest in minimizing the secondary effects of sexually oriented businesses. As Deja Vu has pointed out, numerous courts have concluded that sexually oriented businesses that serve alcohol actually present an *increased* risk of adverse secondary effects. *See*, *e.g.*, *N.Y. State Liquor Auth. v. Bellanca*, 452 U.S. 714, 718 (1981) ("Common sense indicates that any form of nudity coupled with alcohol in a public place begets undesirable behavior."). The more restrictive limitation on the hours of operation of adult cabarets that do not serve alcohol is thus unwarranted.

The Township's purported inability to regulate the hours of alcohol-serving cabarets due to conflicting state liquor laws[3] is irrelevant to the constitutional analysis. If the Township's true concern is limiting the secondary effects of nude dancing after midnight, then it logically would have required *all* cabarets to cease nude dancing at midnight, even though the cabarets that serve alcohol legally could remain open later pursuant to their liquor permits (but not offer nude dancing after midnight). Instead, the Resolution addresses the secondary effects illogically, by permitting patrons of alcohol-serving cabarets to increase their level of intoxication after midnight while simultaneously eliminating an alcohol-free option after midnight for people who have consumed liquor at other local bars and taverns. Under the Resolution, patrons of bars and taverns who wish to frequent an adult cabaret after midnight have no choice but to go to a cabaret that not only serves liquor but which already may have a contingent of intoxicated patrons in attendance, thereby exacerbating the purportedly volatile mix of alcohol and erotica. The Township's willingness to tolerate – and, indeed, encourage – this far more palpable and obvious risk of negative secondary

---

[1] *See* J.A. 67 (Affidavit of Jason Garvey, general manager of the Deja Vu club in Cincinnati) (stating that "the most popular time of the day for customers to visit are the late evening hours, and specifically between 10:00 p.m. and 3:00 a.m."; further opining that, based on his experience, the club would not recapture the dances that the customers would normally purchase after midnight from customers coming to the club earlier in the evening).

[2] We review the grant or denial of a preliminary injunction for an abuse of discretion. *Allied Sys., Ltd. v. Teamsters Nat'l Auto. Transporters Indus. Negotiating Comm.*, 179 F.3d 982, 985 (6th Cir. 1999) (citation omitted). "An abuse of discretion exists when the district court applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *Id.* at 985-86 (internal quotation marks and citation omitted). A district court's findings of fact are reviewed for clear error, and its conclusions of law *de novo. Id.* (citation omitted).

[3] *See* Maj. Op. at 10; Resolution No. 00-22 § M(1) ("Adult cabarets shall close no later than 12:00 Midnight or not later than the closing time required under its permit to sell alcoholic beverages, whichever is later….").

effects demonstrates the complete mismatch between the Township's interest in ameliorating negative secondary effects and the means it has chosen to achieve that end.

Contrary to the majority's mischaracterization, I do not "propose[] as a solution the more speech-restrictive alternative" of requiring all cabarets to cease nude dancing at midnight. Maj. Op. at 12. I only point out the patently ridiculous and irrational manner in which the Township has attempted to address its purported goal of minimizing the secondary effects associated with the combination of nude dancing and alcohol. Because the Township has failed to articulate any logical, let alone empirically supported, basis for requiring non-alcohol-serving cabarets to close several hours earlier than those that serve alcohol, my only "proposal" is that the midnight closing time for non-alcohol-serving cabarets is unconstitutional. The implication of this proposal is that, on this record, non-alcohol-serving cabarets should be permitted to remain open at least as late as their alcohol-serving counterparts. Although the Township can act incrementally to alleviate negative secondary effects, it cannot act arbitrarily, which it has done in this case.

The majority also is misguided in asserting that Union Township has "relied upon *research* suggesting that the patrons of alcohol-free adult cabarets are often more unruly because these cabarets are frequently patronized later in the evening by customers who have become intoxicated at other establishments." Maj. Op. at 10 (emphasis added). The Township has cited no such research whatsoever. The only justification that Union Township has proffered on the subject of closing times is contained in the affidavit of Union Township's administrator, Kenneth Geis. The Geis affidavit states, in relevant part:

> The closing time of Midnight was included in an effort to insure the adult cabaret would close before the closing time of the bars and taverns in the area. There was concern that during the hours after Midnight there was a greater chance that intoxicated male patrons would cause a danger to themselves and to the employees of the adult cabarets and would cause increased criminal activity in the surrounding neighborhood.

(J.A. 105, ¶ 12.) The affidavit does not refer to any "research" showing that (a) alcohol-free cabarets are more unruly after midnight and (b) customers who have become intoxicated elsewhere are responsible for this purported increase in unruliness after midnight. Instead, the affidavit references only the speculative "concern" of some unidentified persons that there was "a greater chance" that drunken men would leave local bars after midnight, frequent adult cabarets, and become unruly. The Resolution's preamble also fails to mention any research in support of these hypotheses.[4]

Although the First Amendment did not require the Township, before enacting the Resolution, to conduct new studies or produce evidence independent of that already generated by other municipalities, it nevertheless had to rely on some "evidence" that was "reasonably believed to be relevant to the problem" that the midnight closing time for non-alcohol-serving cabarets was designed to address. *Renton*, 475 U.S. at 51-52; *accord Weinberg v. City of Chicago*, 310 F.3d 1029, 1038 (7th Cir. 2002) ("In the context of a First Amendment challenge under the narrowly tailored test, the government has the burden of showing that there is evidence supporting its

---

[4] The majority correctly notes that Geis's affidavit documents instances of patrons engaging in criminal activity in an adult cabaret. Maj. Op. at 10-11. The majority fails to mention, however, that the criminal activity took place at an alcohol-serving cabaret and that the consumption of alcohol exacerbated the activity. *See* J.A. 104-05, at ¶ 8 ("There were numerous liquor law violations associated with the operation of the establishment.… A police officer attempting to effect an arrest of an intoxicated patron was seriously assaulted. The patron pled guilty to assault, resisting arrest, and DUI."). Thus, this empirical evidence does not support an earlier closing time for adult cabarets that do not serve alcohol. In addition, because Geis does not indicate the time of day during which this criminal activity took place, this empirical evidence also does not justify a midnight closing time.

proffered justification.") (citing *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 829 (7th Cir. 1999)). The Township cannot "get away with shoddy data or reasoning." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002). Its "evidence must fairly support the municipality's rationale for its ordinance." *Id.* Here, there is no empirical evidence – let alone, "research" – that rationally supports a substantially earlier closing time for non-alcohol-serving cabarets. *Cf. Executive Arts Studio, Inc. v. City of Grand Rapids*, 391 F.3d 783, 796-97 (6th Cir. 2004) (holding that zoning ordinance for adult book sellers was facially invalid because it was not narrowly tailored; reasoning that "the City has cited no basis, study or third party experience that would lead one to believe that such a broad ordinance is needed to control undesirable blight rather than merely being an attempt to control undesired speech").

For similar reasons, the Resolution's hours of operation provision runs afoul of the Equal Protection Clause of the Fourteenth Amendment. It does not bear "a rational relationship to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440 (1985). Deja Vu correctly argues that the Township seeks to regulate and possibly prevent operators of adult cabarets that do not serve liquor from engaging in constitutionally protected conduct during certain times, midnight to 2:30 a.m., while arbitrarily excluding operators of adult cabarets that serve liquor from this hours of operation restriction. Such a difference in classification and application of the resolution is irrational, and thus unconstitutional under the Equal Protection Clause, because it fails to advance the Township's legitimate interests in minimizing the adverse secondary effects of sexually oriented businesses. *See id.* at 447-48.

For the foregoing reasons, I would hold that the Resolution's hours of operation provision violates the First Amendment and Equal Protection Clause of the Fourteenth Amendment.

**III.**
**CONCLUSION**

In summary, the Township's Resolution is unconstitutional because it does not provide for judicial review of a significant number of adverse licensing decisions. As a consequence, it constitutes a prior restraint on freedom of expression as guaranteed under the First Amendment of the United States Constitution. In addition, Deja Vu is entitled to a preliminary injunction as to the Resolution's hours of operation provision because it violates both the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. For all of the reasons set forth above, I would affirm in part and reverse in part the district court's order granting a preliminary injunction.

---

**DISSENTING IN PART**

---

BOYCE F. MARTIN, JR., Circuit Judge, with whom Judges DAUGHTREY and MOORE join, dissenting in part. We join Judge Clay's dissent concluding that the ordinance amounts to an unconstitutional prior restraint on protected expression. The ordinance simply fails to provide for judicial review of a Board decision to not renew or to revoke a permit for an adult cabaret when the decision is issued "preliminary to or as a result of a criminal proceeding." We also agree with Judge Clay that the hours of operation provision fails the constitutional standard of being "narrowly tailored to serve a significant governmental interest." The ordinance therefore violates the First Amendment. Because we would invalidate the hours of operation provision on First Amendment grounds, we would not reach the parties' Equal Protection challenge.