RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0063p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

729, INC., FOXX RESTAURANTS, INC., THE VENUS
LOUNGE, INC., PATSY HIATT, TINA STURGEON,
WANDA BLANKENSHIP,
                          *Plaintiffs-Appellants,*

FOSTER, INC.,
                          *Plaintiff,*

KIM FORAN, LIBERTY'S SHOW LOUNGE, INC.,
                          *Intervening Plaintiffs,*

                   *v.*

KENTON COUNTY FISCAL COURT,
                          *Defendant-Appellee.*

No. 06-6390

>

───────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 04-00212—David L. Bunning, District Judge.

Argued: July 17, 2007

Decided and Filed: February 6, 2008

Before: BOGGS, Chief Judge; and CLAY and ROGERS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Jennifer M. Kinsley, SIRKIN, PINALES & SCHWARTZ, Cincinnati, Ohio, for
Appellants. Christopher S. Nordloh, NORDLOH LAW OFFICE, Covington, Kentucky, for
Appellee. **ON BRIEF:** Jennifer M. Kinsley, H. Louis Sirkin, SIRKIN, PINALES & SCHWARTZ,
Cincinnati, Ohio, for Appellants. Christopher S. Nordloh, NORDLOH LAW OFFICE, Covington,
Kentucky, Garry L. Edmondson, Stacy M. Hege, KENTON COUNTY ATTORNEY'S OFFICE,
Covington, Kentucky, for Appellee.

    BOGGS, C. J., delivered the opinion of the court, in which ROGERS, J., joined. CLAY, J.
(pp. 17-21), delivered a separate opinion dissenting in part and concurring in part.

---

**OPINION**

---

BOGGS, Chief Judge.  This case stems from Kenton County's enactment of a licensing ordinance that comprehensively regulates sexually oriented businesses within the County's jurisdiction.  A group of such businesses and their employees brought suit against the County under 42 U.S.C. § 1983 and K.R.S. § 418.040, challenging the constitutionality of the Ordinance.  Before the district court, the plaintiffs raised more than ten separate constitutional claims.  Both sides moved for summary judgment, which the district court granted to the County.

The plaintiffs raise four issues on appeal.  First, they claim that the Ordinance violates the First Amendment by barring entertainers from entering areas of an establishment occupied by customers within one hour of the entertainers' performing semi-nude on stage.  Second, they claim that the Ordinance violates their rights under the Contracts Clause of Article I, § 10 of the Constitution.  Third, they claim that the Ordinance's judicial review provisions do not satisfy the First Amendment's prompt-judicial-review requirements.  Fourth, they claim that the Ordinance's license fees are excessive, content-based taxes that violate the First Amendment.  Following a brief recitation of the background of this case, we address each of the plaintiffs' challenges in turn, relating details relevant to each respective challenge when appropriate.  Ultimately, we affirm the district court with respect to the first three challenges and we vacate and remand for further proceedings with respect to the fourth challenge.

I

On August 17, 2004, the County adopted Ordinance No. 451.7, which regulated "sexually oriented businesses" within the County and required that such businesses, along with managers and entertainers working therein, obtain licenses from the County.  The Ordinance has been amended several times since this case began.  The current version of the Ordinance, No. 451.12, is the subject of this appeal.

Businesses must submit a required application, along with a fee of $3,000, in order to secure a license.  Should a business's license be denied, the County refunds $1,500 of that fee.  The applicable fee for entertainers and managers is $155, none of which is refundable.  The Ordinance also creates a structure for administrative appeal of license denials and allows for judicial review of such denials "in a manner provided by law."

Two segments of the Ordinance govern a licensee's responsibilities.  First, Sections 14 and 15, taken together, impose affirmative duties on licensees, breaches of which are punishable within the County's administrative framework.[1]  When a licensee fails to fulfill a duty, the County can levy a penalty.  For some violations, the penalty is a point-assessment.  Whereas an establishment or managerial licensee can accrue twenty-four points over a two-year period before its license is subject to revocation, an entertainer licensee is permitted only eighteen points within the same period.  More serious violations, though, may result in suspension or revocation as a penalty instead of a point-assessment.  Second, Section 22 defines certain courses of conduct as "violations of chapter" that constitute misdemeanor offenses under Kentucky law.  There is an overlap between conduct criminally punishable under Section 22 and conduct that could bring administrative sanction under Sections 14 and 15.  Section 22 makes operating without a current, non-suspended license a misdemeanor offense.

---

[1]Sections 16 and 17 of the Ordinance create the administrative framework.  The former governs point-assessments, whereas the latter applies whenever "there has been a violation of any provision" of the Ordinance.

II

We review a district court's grant of summary judgment *de novo. Trustees of the Mich. Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 590 (6th Cir. 2000). The decision below may be affirmed only if the pleadings, affidavits, and other submissions show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We must draw all reasonable inferences in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

III

The plaintiffs first attack the Ordinance's commingling provision, which is found within the affirmative-duty provisions of Sections 14 and 15. Because the provision was intended to target prostitution, likely will have the effect of reducing prostitution, and leaves substantially intact the amount of protected speech, we reject this challenge.

The provision at issue reads as follows:

> [E]ntertainers [must] maintain a minimum distance of five (5) feet from areas on the establishment's premises being occupied by customers, for a minimum of one (1) hour after the entertainer appears semi-nude on the establishment's premises. This regulation is not intended to prohibit ingress or egress from the premises or entertainers [sic] use of the premises' common restroom. It is intended to control illicit sexual contact and reduce the incidents of prostitution occurring in the establishments. Regulating a reasonable delay between the times the entertainers appear semi-nude and their commingling with customers is a narrowly tailored furtherance [sic] of this interest. **Penalty for violation: license suspension after being cited for two (2) such violations**.

JA 364 (emphasis in original). Because the Ordinance forbids anyone from being semi-nude anywhere but on stage, this provision requires that an entertainer stay at least five feet away from areas being occupied by customers for at least one hour after the entertainer performs semi-nude on stage. Managers, establishments, and entertainers each have an affirmative duty to ensure the enforcement of this provision.

Although the plaintiffs contend that this provision should be subjected to strict scrutiny, it is well-settled that laws targeting the "secondary effects" of adult-entertainment establishments are subject to intermediate scrutiny. In *Renton v. Playtime Theatres, Inc.,* the Supreme Court held that an ordinance designed to concentrate such establishments in one area of a city would be subject to intermediate scrutiny because it was a content-neutral time, place, and manner restriction. 475 U.S. 41, 46-47 (1986). Although five members of the Court abandoned the premise that such restrictions are content-neutral sixteen years later in *City of Los Angeles v. Alameda Books*,[2] the Court continued to apply intermediate scrutiny to laws targeting "secondary effects." 535 U.S. 425, 429 (2002) (applying intermediate scrutiny to an ordinance dispersing, rather than concentrating, adult businesses). In each of those cases, the Court applied its earlier ruling in *United States v. O'Brien*,

---

[2]Justice Kennedy concurred only in the judgment, writing that "[t]hese ordinances are content based and we should call them so." *Alameda Books*, 535 U.S. at 448. The four dissenting justices had the same assessment. *Id*. at 455 ("Because content-based regulation applies to expression by very reason of what is said, it carries a high risk that expressive limits are imposed for the sake of suppressing a message that is disagreeable to listeners or readers, or the government.") (Souter, J., dissenting, joined by Stevens, Ginsburg, and Breyer, JJ.).

which set intermediate scrutiny as the standard when the government regulates pursuant to an interest unrelated to speech's content. *See* 391 U.S. 367 (1968).

There is no doubt that prostitution constitutes a "secondary effect" within the meaning of the pertinent case law. *See Alameda Books*, 535 U.S. at 430. Because the County sought to target prostitution, intermediate scrutiny applies here. In order to survive such scrutiny, a regulation must meet three requirements. First, the government must have had the actual purpose of suppressing "secondary effects" when it enacted the ordinance. *White River Amusement Pub, Inc., v. Town of Hartford*, 481 F.3d 163, 171-72 (2d Cir. 2007) (collecting cases). *See also Christy v. Ann Arbor*, 824 F.2d 489, 493 (6th Cir. 1987). Second, the entity must have had a reasonable evidentiary basis for concluding that its regulation would have the desired effect. Although not extraordinarily high, this evidentiary burden requires that the entity show that the evidence upon which it relied was "reasonably believed to be relevant to the problem" that the entity sought to address. *Renton*, 475 U.S. at 51-52; *Alameda Books*, 535 U.S. at 438, 439 (plurality); *Id.* at 449 (Kennedy, J., concurring in the judgment). Third, the ordinance must leave "the quantity and accessibility of speech substantially intact." *Id.* at 449 (Kennedy, J., concurring in the judgment); *id*. at 450 ("As discussed, the necessary rationale for applying intermediate scrutiny is the promise that zoning ordinances like this one may reduce the costs of secondary effects without substantially reducing speech."). Although the *Alameda Books* plurality did not discuss the third requirement, Justice Kennedy expressly said that consideration of this issue was required for his concurrence in the judgment. Justice Kennedy's opinion binds us on this point. *See, e.g.*, *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 722 (7th Cir. 2003).

Under the above test, the plaintiffs' challenge to the commingling provision must fail. First, there is no doubt that the County sought to target prostitution. The County hired consultants to investigate the presence of prostitution and other harms in the adult establishments within the County. In enacting the Ordinance, the County relied on the consultants' first-hand observations, on evidence from other jurisdictions, and on first-hand reports of police officers. In the provision at issue, the County noted that the provision "is intended to control illicit sexual contact and reduce the incidents of prostitution occurring in the establishments." The record demonstrates quite clearly that the County sought to target prostitution.

The County also adopted a regulation "reasonably believed to be relevant" to solving that problem. Five women from one club in Covington, Kentucky, were charged with prostitution as the result of a police raid. At that club, the undercover officers who conducted the raid said they were "solicited for sex 'within 7 minutes of entering the club.'" In some clubs, the County's consultants observed sexual activity occurring. In other clubs, they received reports from entertainers indicating that sexual activity had occurred in those clubs in the past.

The consultants' observations about the establishments' business model is also revealing. Customers purchase "drinks" from an establishment's bar. By purchasing a drink, a customer gains time with an entertainer. As the price of the drink increases, the amount of time increases. In some establishments, the privacy of a conversation's location also varies directly with the drink's cost. For more lengthy "conversations," the price of a drink can exceed $1,000. "Dancers did confide" to the consultants "that oral sex has occurred during the more lengthy 'conversations.'" To be sure, the plaintiffs did put forward evidence that, at some clubs, "buying a conversation was simply [buying a conversation]." However, we think it a reasonable conclusion on this record that there is an enhanced risk of prostitution when the purchase of a higher-priced drink brings a longer and more secluded "conversation" between an adult entertainer and a customer. The direct and circumstantial evidence relied upon by the County demonstrates the existence of a prostitution problem under *Alameda Books*.

The County's chosen course also seems reasonably designed to reduce prostitution. As noted, the provision at issue requires that an entertainer stay at least five feet away from areas being occupied by customers for at least one hour after the entertainer performs semi-nude on stage. As applied to these clubs, it is clear that the provision at issue will substantially lessen the number of entertainers who can commingle with customers. The average number of entertainers employed on a given night at these clubs is between seven and eight. Almost uniformly, the consultants found that the entertainers danced for two-song sets lasting roughly six minutes. As a result, full performances by each entertainer, back to back, would take only forty-two to forty-eight minutes. Absent an alteration in that schedule, the restriction would leave few, if any, gaps during which entertainers who dance semi-nude on a given night could commingle with customers. Given that the prostitution problem in the County arises directly from the mingling of customers and entertainers during "conversation drinks," we hold that the provision at issue is related directly to curbing prostitution.

To be sure, establishments may find ways to minimize the Ordinance's effect. Dancers who do not dance on a particular night are free to mingle with customers. Establishments might also lengthen entertainers' performances or increase the length of breaks in between performances. Such measures would create greater gaps during which entertainers who had performed could mingle with customers. Nevertheless, the provision's aggregate effect will be to reduce both the number of entertainers available to mingle and the amount of time they can spend mingling. We cannot say that the Ordinance is not reasonably designed to further the County's interest simply because those subject to it might try to lessen its impact.

We next examine whether the provision leaves "quantity and accessibility of speech substantially intact." *Alameda Books*, 535 U.S. at 449-50 (Kennedy, J., concurring in the judgment). In the context of the zoning ordinance at issue in *Alameda Books*, Justice Kennedy wrote: "If two adult businesses are under the same roof, an ordinance requiring them to separate will have one of two results: One business will either move elsewhere or close. *The city's premise cannot be the latter.* It is true that cutting adult speech in half would probably reduce secondary effects proportionately. But again, a promised proportional reduction does not suffice." *Ibid.* (emphasis added). Justice Kennedy then voted to uphold the ordinance because "[d]ispersing . . .adult businesses . . . is reasonably likely to cause a substantial reduction in secondary effects while reducing speech very little." *Id.* at 451.

We conclude that this provision leaves the quantity and accessibility of protected speech substantially intact for several reasons. First, it restricts only those dancers performing on a particular night and restricts them only for an hour after their performances. Those not performing on a particular night may mingle as they wish; those performing may mingle after the time bar passes. Second, entertainers may still remain five feet from areas that customers occupy, so the provision permits entertainers who performed within the previous hour to speak with customers, as long as the entertainers are in areas five feet away from areas accessible to customers. *Cf. DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 412 (6th Cir. 1997) (upholding a six-foot buffer zone between customers and the stage). Third, the provision does not bar *communication* itself. Instead, it bans physical presence in a particular area for a particular length of time. Should entertainers within the club want to converse with patrons from five feet away, or via cellular phone, closed-circuit television, or electronic chat, this provision would serve as no bar to such conversation. Nothing in the Ordinance bars entertainers from arranging specific times to meet outside the adult establishments or, say, at the local coffee house. There, discussions of literature, public affairs, or eroticism may flow freely. We simply cannot conclude that this provision, which regulates commingling only in a particular place and only for a limited period of time, substantially impairs the quantity and accessibility of protected speech.

In other words, the County has targeted contact between adult entertainers and customers that created a risk of prostitution. It has done so in a manner that substantially preserves the ability of those affected to communicate with each other, although in a less physical way than they could previously. We thus conclude that the provision satisfies intermediate scrutiny.

IV

The plaintiffs next contend that the whole Ordinance violates the Contracts Clause of Article I, Section 10, of the Constitution because it impairs a settlement agreement between some of the plaintiffs[3] and the City of Covington. We reject this claim.

The Contracts Clause says that "No state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. Art. I § 10, cl. 5. There are three factors that courts must consider when evaluating Contracts Clause claims. The first factor is "whether the complainant has shown 'a substantial impairment' of a contractual relationship." *Linton by Arnold v. Comm'r of Health & Env't*, 65 F.3d 508, 517 (6th Cir. 1995) (citing *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-12 (1983)). Because this factor suffices to dispose of the plaintiffs' Contracts Clause claim, we decline to address the other two.

Establishing a "substantial impairment" requires showing (1) that there is a contractual relationship; (2) that a change in law impairs that contractual relationship; and (3) that the impairment is substantial. *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992). Although no agreement is in the record of this case, we will assume that a settlement agreement exists and that it constitutes a "contract" under the Clause. *Cf.*, *e.g.*, *Mascio v. Pub. Employees Ret. Sys.*, 160 F.3d 310 (6th Cir. 1998) (holding that a pension agreement between an individual and Ohio was protected by the Contracts Clause).

The plaintiffs cannot show that any settlement agreement between themselves and the City of Covington was substantially impaired. First, the background Kentucky law makes clear that valid county ordinances trump city ordinances in cases like this one. K.R.S. § 67.083(7). The County clearly had the power both to enact this Ordinance and to make the Ordinance effective within Covington's borders. Under the Kentucky Constitution, only when a power is *expressly* granted to a county government may it exercise that power within an incorporated city. *Fiscal Court of Jefferson County v. City of Louisville*, 559 S.W.2d 478, 481 (Ky. 1977) (striking down under the Kentucky Constitution broad delegation of power to county fiscal courts but upholding express delegations).[4] Because the General Assembly expressly has delegated the power to regulate adult businesses to county fiscal courts, *see* K.R.S. § 67.083(3)(z), the County had the power to enact an adult-entertainment ordinance that would operate within Covington's borders. Under Kentucky law, when a county enacts a valid ordinance that prescribes penalties, it will trump a less strict city ordinance. K.R.S. § 67.083(7). There is no question that the Ordinance at issue here creates a system of administrative and criminal penalties. And, as noted above, the Ordinance is a valid exercise of County power. Accordingly, it trumps any less strict Covington ordinance.

---

[3] The settlement agreement is not in the record in this case, nor is it in the joint appendix. As a result, it is unclear which of the plaintiffs were parties to the agreement. However, that fact is irrelevant to this claim's resolution because the City of Covington could not have had the power to bind Kenton County, under Kentucky law. No reasonable private party could expect its agreement with a city to trump county enactments. Because no such claim could succeed, it is unnecessary to examine the substance of or the parties to the settlement agreement.

[4] "The metallic thread which history and tradition weave through the warp and woof of our Constitution is that while the General Assembly may grant governmental powers to counties it must do so with the precision of a rifle shot and not with the casualness of a shotgun blast." *Fiscal Court of Jefferson County*, 559 S.W.2d at 481.

Second, that background rule must have been incorporated into any agreement between Covington and the plaintiffs. The agreement at issue here did not involve two parties, each with full power to contract. Instead, one party, Covington, could have agreed only to exercise its own power in a particular way. No reasonable party could have expected Covington to sign away power that it did not possess, and which belonged to a legally superior entity. *Cf. Energy Reserves*, 459 U.S. at 411 (quoting *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38 (1940)). Because the plaintiffs never reasonably could have interpreted Covington's assent as being broader than Covington's power under Kentucky law, we hold that there could have been no substantial impairment of the settlement agreement.

Moreover, when an industry is highly regulated, it is unlikely that an exercise of general legislative power will constitute a substantial impairment of contract rights. *Energy Reserves*, 459 U.S. at 11 (quoting *Veix*, 310 U.S. at 38). *See also Hudson Water Co. v. McCarter*, 209 U.S. 349, 357 (1908). There are few industries more highly regulated than adult entertainment. That much is illustrated by the history of such regulation in Covington and Kenton County, by the provisions of Kentucky law expressly granting to counties and cities the power to regulate adult businesses, *see* K.R.S. §§ 82.082(1) (cities) & 67.083(3)(z) (counties), and by the multitude of other municipal ordinances covered by the consultants' report.

Thus, given the Kentucky-law background and the highly regulated status of the adult-entertainment industry, the plaintiffs cannot reasonably have expected their agreement with Covington to bar future regulation by the County. Accordingly, we reject the plaintiffs' Contracts Clause claim.

V

The plaintiffs next challenge the Ordinance's review provisions, claiming that they do not provide sufficiently prompt judicial review. Because they regulate protected speech, the review provisions must satisfy applicable prior-restraint jurisprudence, which contains two requirements. *FW/PBS v. Dallas*, 493 U.S. 215, 227-30 (1990). First, "any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained." *Ibid.* Second, there must be prompt judicial review of the licensor's decision, which includes a prompt judicial decision. *Ibid. See also City of Littleton v. Z.J. Gifts*, 541 U.S. 774, 781 (2004).

As long as the regulation at issue "applies reasonably objective, nondiscretionary criteria" and "does not seek to censor content," a state's ordinary court procedures will satisfy the second requirement. *Bronco's Entm't v. Charter Twp. of Van Buren*, 421 F.3d 440, 444 (6th Cir. 2005) (citing *Z.J. Gifts*, 541 U.S. at 783). However, "[i]f a licensing scheme involves the application of subjective standards, rules requiring a speedy judicial decision may be necessary." *Ibid. See also Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 787 (6th Cir. 2005) (noting that licensing ordinances applying subjective standards, such as the ordinance at issue in *Freedman v. Maryland*, 380 U.S. 51, 59 (1963), "necessitate[] that strict time limits be placed on judicial review") (citing *Z.J. Gifts*, 541 U.S. at 780, and quoting *FW/PBS*, 483 U.S. at 22).

A

Addressing plaintiffs' challenges requires a detailed explication of the Ordinance's review provisions, which are both administrative and judicial in nature. The administrative provisions may be split into three parts: (1) review upon the rejection of an application for a new or renewed license, *see* § 11; (2) review upon the assessment of points by the License Inspector, *see* § 16; and (3) review upon the institution of a license-related penalty, such as suspension or revocation, for a

violation of any of the Ordinance's provisions, *see* § 17.[5]  Each of those administrative sections contains a clause providing for judicial review "in a manner provided by law." *See* §§ 11(f), 16(h), & 17(d). Section 19 contains a judicial-review provision that applies to license denials, suspensions, and revocations, as well as a provision that stays the effect of orders denying, suspending, or revoking  license during the pendency of judicial review.  Section 22, which creates misdemeanor penalties, is not relevant to the outcome of this appeal.  We address the relevant review procedures in turn.

1

Upon the filing of a complete application for a new license or for the renewal of an existing license, the County issues a temporary license that remains in effect pending administrative and judicial review.  If an application for a new or renewal license is denied, the applicant may request a hearing for reconsideration, which must be filed within ten days of the receipt of the initial decision.  There is no obligation to pursue an administrative appeal; judicial review "in a manner provided by law" may be sought immediately.  If an appeal is filed, a hearing must be scheduled for within fifteen calendar days from the date of filing.  Once a hearing is held, a decision must be issued within ten days.

With regard to point-assessment hearings under Section 16, the Ordinance contains the following review procedures.  The Ordinance requires notification by mail of the License Inspector's point-assessment and then permits an appeal of that assessment to a Hearing Officer within twenty days.  The Hearing Officer must then schedule a hearing that must occur within ten days of the receipt of the appeal.  Within ten days of the hearing, the Hearing Officer must issue a decision setting forth findings of fact and conclusions of law.  Once again, there is no obligation to pursue an administrative appeal before seeking judicial review.  "Any license holder aggrieved by the decision of either the License Inspector or the Hearing Officer to assess points may seek judicial review in a manner provided by law."

With regard to administrative "violation of chapter" hearings, the following process is in place.  Whenever the License Inspector receives "verified or otherwise credible information" that a "violation of chapter" has occurred,[6] the Hearing Officer is obligated by Section 17 to hold a

---

[5]It is not immediately clear from Ordinance's text whether the affirmative-duty provisions that carry penalties of suspension or revocation (rather than only point penalties) are administered as "point-assessments" under Section 16 or as "violation[s] of chapter" under Section 17.  We think the most logical reading of the Ordinance places the administration of those violations under Section 17.  Section 16's point-assessment hearings apply only to those instances where points are assessed.  That reading is most consistent with Section 16 itself, which requires notice to the licensee "that points have been assessed," permits administrative review after "points have been assessed," and allows for judicial review of the County's decision "to assess points."  Section 17's "Violation of Chapter" hearings apply to any violation that is not governed by a more specific provision.  It is the provision of general application.  It applies to "a violation of any provision" of the Ordinance, which would include violations of the affirmative duties listed in Sections 14 and 15 that are not punishable by the assessment of points.  Although Section 22 does include the term "violation of chapter" in its title, its provisions apply to courses of conduct that violate provisions of the Ordinance *and* are serious enough to warrant the imposition of criminal liability.  Section 22 expressly acknowledges an overlap between conduct that is criminally punishable and conduct subject only to administrative penalty, so it poses no bar to this reading of Section 17.  ("[T]he same factual circumstances may lead to a penalty under [Section 22] and also affect the ability of the individual to hold a license.").

[6]These hearing provisions also apply if "any of the conditions required for the issuance of a license have changed" or if "anything on the license may have been untrue or incomplete."

hearing.[7]  The subject of the hearing is whether the licensee has violated "any of the provisions listed in this Chapter."  The Hearing Officer must set the date for the hearing for some date between ten and thirty days after the Inspector's receipt of the information indicating that a violation occurred.  If the Hearing Officer finds a violation, "he may suspend or revoke the license issued under this chapter, or in the case of a renewal application," he may "refuse to renew such license."  The Hearing Officer must "issue findings of fact and conclusions of law and an order wherein the Hearing Officer may dismiss the complaint, or suspend or revoke a license or permit previously issued, or renew or refuse to renew a license previously issued."  "Any license holder aggrieved by the decision of the Hearing Officer to suspend such license . . . may seek judicial review in a manner provided by law."[8]

In addition to the specific judicial review provisions noted above, the Ordinance also contains another provision, Section 19, that guarantees judicial review to challenge the denial of a new or renewal license application or the suspension or revocation of an existing license.  Section 19 contains two clauses:  a  judicial-review clause and a stay-of-enforcement clause.  The former says that, "[f]ollowing a final decision by the License Inspector or Hearing Officer denying, suspending or revoking a license, or disapproving the renewal application for a license, such licensee or applicant may seek judicial review in a manner provided by law."  The latter says that "the License Inspector or Hearing Officer *shall stay enforcement* of the Ordinance *pending the final disposition* of proceedings for judicial review, *during which time the status quo* of the applicant *will be maintained*." (emphasis added).

We note that there is an ambiguity in Section 19.[9]  Section 19 refers only to preserving the status quo for an "applicant," not for a licensee.  It is unlikely that this textual distinction was an oversight because the "judicial review" clause of the same section by its terms applies to "a licensee or applicant."  Were the Ordinance to countenance the suspension or revocation of a license during the pendency of judicial review, it would raise serious constitutional problems.  *See Bronco's Entm't*, 421 F.3d at 444 ("[T]he status quo must be maintained during that period and during the course of any judicial review.") (citing *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400-01 (6th Cir. 2001)).  Section 19 need not be read to countenance suspension or revocation pending judicial review, however, and the Ordinance is at least ambiguous on this point.  Section 19 provides for judicial review of various adverse administrative actions, including denials, suspensions, and revocations, and, immediately following that provision, states:  "The License

---

[7]The procedural protections in the Section 17 "violation of chapter" hearings are substantially more robust than those in the Section 16 point-assessment hearings.  *Compare* § 17(b)(2) (listing procedural rights, including the calling of witnesses who will testify under oath, the production of evidence, the subpoena power for people and for documents) *with* § 16(e) (providing for the right to examine or cross-examine any witness, but not listing with specificity procedural protections similar to those contained within § 17(b)(2)).

[8]Although Section 17 appears only to provide judicial review for license holders aggrieved by decisions to *suspend*, and not by decisions to revoke, license holders subject to revocation proceedings may still obtain judicial review under Section 19's general judicial review provision, which, as discussed below, provides judicial review for denials, suspensions, and revocations.

[9]Section 19 also contains a less significant ambiguity, which arises from the stay-of-enforcement clause.  That clause provides for the continuation of the status quo "pending the final disposition of proceedings for *judicial* review." (emphasis added). It says nothing about administrative proceedings.  However, the judicial-review clause applies only after the "final disposition" of administrative proceedings.  In "violation of chapter" proceedings, there is no decision impairing a licensee's operational ability until the Hearing Officer issues one.  In a case where an accumulation of points results in a decision by the licensor to revoke or suspend a license, the stay-of-enforcement clause also would stay the enforcement of the order "pending the final disposition of proceedings for judicial review."  Since licensees need not even appeal a point-assessment administratively before seeking judicial review, they need not endure any delay that would result from the administrative proceeding.

Inspector or Hearing Officer shall stay enforcement of the Ordinance pending the final disposition of proceedings for judicial review . . . ." If enforcement of the Ordinance is stayed pending a final judicial decision on the validity of a suspension or revocation, no licenses will be suspended or revoked pending judicial review. The text following this stay-of-enforcement provision ("during which time the status quo of the *applicant* will be maintained") need not be read to limit stays of enforcement (effectively, maintenance of the status quo for license holders) only to applicants, given all of the text preceding that clause.

At oral argument, moreover, the County Attorney expressed his understanding that licensees subject to suspension or revocation could operate during the pendency of both administrative and judicial review. Accordingly, given the Ordinance's textual ambiguity and the County's proffer at oral argument, we read Section 19 to permit both licensees and applicants to operate during the pendency of administrative and judicial proceedings.

B

We now address the plaintiffs' challenges to the Ordinance's judicial-review provisions. At each step of the Ordinance's administrative process, applicants and licensees may seek judicial review "in a manner provided by law." Although we acknowledge the vagueness of that language, we conclude that the Ordinance's language points to judicial review pursuant to K.R.S. § 23A.010(4), which provides generally for judicial review of administrative action. In *Nightclubs, Inc., v. City of Paducah*, 202 F.3d 884, 891-92 (6th Cir. 2000), this court dealt with a city ordinance that provided for judicial review "in any court of competent jurisdiction." We read that language to apply K.R.S. § 23A.010(4). *Ibid.* Based on *Nightclubs*, we conclude in this case that judicial review "in a manner provided by law" under the County's ordinance refers to review under K.R.S. § 23A.010(4).

The plaintiffs allege that review under § 23A.010(4) fails to satisfy the requirements of the First Amendment because it creates "infinite delays" in the process of reaching a judicial determination. For this proposition, they refer to *Nightclubs*, which held that § 23A.010(4) was unconstitutional as applied to an adult-entertainment licensing ordinance. In *Nightclubs*, the court noted that such judicial review would not "in any way limit the time for furnishing transcripts, conducting a court hearing, or rendering a judicial decision." 202 F.3d at 892 (citing *East Brooks Books v. City of Memphis*, 48 F.3d 220, 224 (6th Cir. 1995)).

*Nightclubs* would be controlling here, but for the Supreme Court's decision in *Z.J. Gifts*. There, the Court held that ordinary judicial review "practices and procedures" satisfy the requirement of prompt judicial review as long as the licensing regulation "applies reasonably objective, nondiscretionary criteria . . . unrelated to the content of the expressive materials that an adult business may sell or display." *Z.J. Gifts*, 541 U.S. at 782-84. The plaintiffs do not argue that the Ordinance at issue employs anything other than such criteria. Hence, the central holding of *Nightclubs* – that ordinary judicial review does not satisfy the "promptness" requirement because it does not offer a specific time limit for a decision – is no longer controlling. As our court recently noted when considering a Tennessee statute, ordinary judicial review generally will satisfy *Z.J. Gifts*. *See Odle v. Decatur County*, 421 F.3d 386, 391 (6th Cir. 2005). Moreover, unlike the ordinance at issue in *Nightclubs*, the Ordinance at issue here preserves the status quo in every relevant respect, including during the pendency of a license application[10] and during the various penalty proceedings. Following *Z.J. Gifts*, the *Nightclubs* court's holding that § 23A.010(4) unconstitutionally delays a prompt judicial decision must be overruled.

---

[10]In one respect, the Ordinance goes further than the status quo for applicants by providing for the issuance of a temporary license upon the filing of an application for a new license. That temporary license remains valid until judicial review concludes.

Nevertheless, the plaintiffs raise two further arguments seeking to distinguish the judicial review at issue here from that upheld in *Z.J. Gifts*. First, they claim that review by the courts under K.R.S. § 23A.010(4) generally is entirely discretionary, and thus violates this court's decision in *Deja Vu of Nashville*, 274 F.3d at 401, because it "fails to guarantee a 'final judicial adjudication on the merits,' as required under *Freedman*'s first safeguard." *Br. of Appellants*, at 41-42. Second, they claim that the standard of review provided by § 23A.010(4) fails to satisfy the First Amendment because it is "of limited scope and confined to limited issues." *Ibid.* We conclude that the plaintiffs' characterizations of Kentucky law on these points are inaccurate and that these arguments lack merit.

First, with respect to discretionary review, the plaintiffs correctly characterize the review that § 23A.010(4) provides in run-of-the-mill cases. In *Taxpayer's Action Group v. Madison County Board of Elections*, 652 S.W.2d 666, 668 (Ky. Ct. App. 1983), the Kentucky Court of Appeals noted that the decision under § 23A.010(4) to review an administrative determination rests within the discretion of Kentucky's trial courts. However, the Kentucky Supreme Court has held specifically that "procedural due process" requires judicial review of administrative action where "constitutional rights are involved." *See Hilltop Basic Res., Inc. v. County of Boone*, 180 S.W.3d 464, 469 (Ky. 2005) (citing *Morris v. City of Catlettsburg*, 437 S.W.2d 753, 755 (Ky. 1969)).

Constitutional rights are involved in every action challenging a licensor's refusal to permit a private party to exercise his First Amendment rights. That is, where what is being administered is a prior restraint on free speech, constitutional rights are obviously implicated. Thus, Kentucky law itself alleviates the plaintiffs' concerns. Precedent indicates that judicial review under § 23A.010(4) of the County's licensing determinations will be accorded as a matter of right. *Hilltop*, 180 S.W.3d at 469; *Morris*, 437 S.W.2d at 755. Under *Z.J. Gifts*, we must "presume" that Kentucky's "courts are aware of the constitutional need to avoid 'undue delay result[ing] in the unconstitutional suppression of protected speech.'" 541 U.S. at 782-84. Thus, the plaintiffs' allegation that the review at issue here is "discretionary" is not borne out by Kentucky law.

Second, with respect to the standard of review, the plaintiffs argue that a claimant challenging administrative action under § 23A.010(4) can only prevail if the administrative determination was "arbitrary and capricious." Again, with regard to run-of-the-mill administrative law cases, the plaintiffs are correct. *See, e.g., Trimble Fiscal Court v. Snyder*, 866 S.W.2d 124, 126 (Ky. Ct. App. 1993). *See also Lab. Corp. of Am. Holdings v. Rudolph*, 184 S.W.3d 68, 73 (Ky. Ct. App. 2005) (public contracts) (quoting *Am. Beauty Homes Corp. v. Louisville & Jefferson County Planning & Zoning Comm'n*, 379 S.W.2d 450, 456 (Ky. 1964)); *Reis v. Campbell County Bd. of Educ.*, 938 S.W.2d 880, 887 (Ky. 1997) (teacher termination); *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986) (worker's compensation); *Thomas v. Cabinet*, 57 S.W.3d 262 (Ky. 2001) (adoption). The plaintiffs also are correct that such judicial review is deferential to administrative determinations, permitting a challenge to succeed only if the administrative action violated procedural due process or if "the evidence in [the challenger's] favor was so compelling as to mandate a finding in his favor." *Snyder*, 866 S.W.2d at 126.

However, as in the context of deciding whether judicial review is discretionary in cases involving constitutional issues, the Kentucky courts have determined that a different, more searching, review applies in First Amendment cases. The Kentucky Supreme Court has adopted the following as a principle of Kentucky law: "[W]hen a regulatory body, directly or indirectly, undertakes the responsibility of restricting constitutionally protected speech, which includes lawyer advertising, it must resolve any doubts in favor of permitting the constitutionally protected speech." *In re Appeal of Hughes & Coleman*, 60 S.W.3d 540, 544 (Ky. 2001).[11] In *Hughes & Coleman*, the

---

[11]The statute at issue in *Hughes & Coleman* provided that the Board's determinations were reviewable for legal errors, clearly erroneous factual findings, or the arbitrary and capricious exercise of discretion. 60 S.W.3d at 543. In that sense, it is broader than the review generally available under § 23A.010(4).

court conducted a searching review of the determinations of the Attorney Advertising Commission and the Board of Governors of the Kentucky Bar Association to disapprove certain attorney advertisements. The court rendered judgment for the attorneys, reversing the Kentucky Bar Association's judgment, because, in part, the Association's decisions "reflect[ed], arguably, a resolution of the doubt against allowing the constitutionally protected speech." *Ibid.*

*Hughes & Coleman* demonstrates that Kentucky's courts will not follow the deferential judicial review that the plaintiffs claim they will impose. Rather, Kentucky's courts will resolve reasonable doubts in favor of protecting speech. *Ibid.* In other words, Kentucky's courts will not apply the standard of review that applies to decisions about zoning, *Snyder*, 866 S.W.2d at 12, or public contracting, *Lab. Corp.*, 184 S.W.3d at 73, to administrative decisions restricting First Amendment rights. The heightened standard of review applied by the Kentucky courts accords with the longstanding principle that courts should apply searching review to actions impinging on the freedom of speech. *See Speiser v. Randall*, 357 U.S. 513, 525 (1958) ("[T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn. The separation of legitimate from illegitimate speech calls for . . . sensitive tools."). *Cf. McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 493 (1991) (applying *de novo* rather than abuse-of-discretion standard to constitutional claims in the context of a particular immigration program); *Wilson v. Bredesen*, 113 F. App'x 70, 74 (6th Cir. 2004) (noting that Tennessee law subjects administrative determinations to *de novo* review when constitutional questions are at issue) (citing *State v. Robinson*, 29 S.W.3d 476, 480 (Tenn. 2000)).

Accordingly, we conclude that the plaintiffs' efforts to distinguish review under § 23A.010(4) from the judicial review upheld by the Supreme Court in *Z.J. Gifts* are unpersuasive. We expressly overrule *Nightclubs* on this issue and hold that, as a general matter, § 23A.010(4) satisfies the First Amendment.

## VI

The plaintiffs next claim that the fees imposed by the Ordinance are unconstitutionally large. The Ordinance imposes a $3,000 license fee for establishments, $1,500 of which is refunded if the license application is denied, and a $155 non-refundable fee for managers and entertainers. The district court, although noting that "the information provided by Defendant" in support of the expenses it would incur in administering the Ordinance "could have been broken out and calculated in more exacting detail," nevertheless upheld the licensing fees because they were "reasonably related to the expenses incident to the administration of the ordinance."

## A

We note from the outset that the Supreme Court has never enunciated a comprehensive approach to the constitutionality of a licensing fee charged for the exercise of First Amendment rights. Thus, we begin from general principles. When the government bears its own costs, one can expect (or at least hope for) a degree of frugality. Elected officials are often loath to incur prodigal or superfluous expenditures because such waste puts them at an electoral risk. Commensurately, the government's decision to incur expenditures is generally immune from legal challenge by the taxpayers. *Cf. Hein v. Freedom From Religion Found., Inc.*, 127 S. Ct. 2553, 2569 (2007). But once the government transfers the cost of a measure to private parties via a licensing fee, that measure becomes subject to private challenge. States generally may enforce their laws as vigorously, or with as much laxity, as they like. A state may choose to call out the National Guard to enforce an adult-entertainment ordinance, but leaving licensees with the check would go too far.

Over the course of several decades, the Supreme Court decided three cases that influence our approach here: *Cox v. New Hampshire*, 312 U.S. 569, 576-77 (1941), *Murdock v. Pennsylvania*, 319

U.S. 105, 114 (1943), and *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992).  We believe that those cases require a consideration in "secondary effects" cases of three questions: (1) whether the fee's maximum amount will deter the exercise of First Amendment rights, (2) whether the measures the cost of which the County seeks to transfer to licensees via its fee structures are narrowly tailored means of advancing the County's interest in curbing secondary effects, and (3) whether the County's cost estimates for those measures are reasonable.  Because the district court did not undertake this inquiry, and because genuine issues of material fact are present on these issues, we vacate the district court's summary judgment on this issue and remand for further proceedings.

B

We now turn to those three Supreme Court decisions.  First, in *Cox*, 312 U.S. at 576-77, the Court upheld a law that required a permit before a group could parade down a public road.  The permit fee ranged from a "nominal" amount to $300, depending on the "public expense or policing" cost associated with the event.  *Ibid.*  The Court held that the *Cox* fee was constitutionally permissible, noting that "there is nothing contrary to the Constitution in the charge of a fee" that is "not a revenue tax, but one to meet the expense incident to the administration of the Act and to the maintenance of public order in the matter licensed." *Ibid*.

Second, in *Murdock*, 319 U.S. at 114, the Court struck down a flat fee charged by a city to all canvassers and solicitors.  The Court held that where a license fee is "fixed in amount and unrelated to the scope of the activities of petitioners or to their realized revenue," it is unconstitutional.  The Court reached that result based on its conclusion that the flat fee was not "imposed as a regulatory measure to defray the expenses of policing the activities in question."  That is, because it forced some licensees to bear more than the costs they would impose,  the fee violated the First Amendment because it required potential licensees to "purchase, through a license fee or a license tax, the privilege freely granted by the constitution." *Ibid*.

Third, in *Forsyth County*, 505 U.S. 130-34, the Court sharply limited *Cox* and struck down a discretionary fee with a high upper limit.  The ordinance at issue provided that applicants for permits had to pay in advance an amount, not to exceed $1,000, to be determined by the licensor and designed to "meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed." *Ibid.*  The ordinance's language was lifted almost word-for-word from the ordinance at issue in *Cox*, 312 U.S. at 577.

Nevertheless, the Court struck it down and made clear that a licensing fee regulation must meet two requirements.  First, it must not delegate overly broad licensing discretion to a government official.  Second, "any permit scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication."  505 U.S. at 130.  In its holding,[12] the Court sharply limited *Cox*, noting that nothing in *Cox* suggested that the New Hampshire statute permitted a licensing fee to vary based on content, such as whether the speech would provoke a hostile reaction from its audience.

Our court has distilled two general principles from *Cox*, *Murdock*, and *Forsyth County*.  First, "an ordinance requiring a person to pay a license or permit fee before he can engage in a

---

[12]The Court held (1) that the ordinance conferred too much discretion, because it was applied by county officials to confer nearly unfettered discretion, and (2) that the ordinance permitted content-based discrimination because the differentials in fee structures were often based on security concerns, which the Court held would amount to a heckler's veto.  *Forsyth County*, 505 U.S. at 133-34.  *Cf.* HARRY KALVEN, JR., *THE NEGRO AND THE FIRST AMENDMENT* 140 (1965).

constitutionally protected activity does not violate the Constitution so long as the purpose of charging the fee is limited to defraying expenses occurred in furtherance of a legitimate state interest." *Northeast Ohio Coalition for the Homeless v. City of Cleveland*, 105 F.3d 1107, 1110 (6th Cir. 1997). In other words, in order to transfer the cost of a government measure to a licensee, the measure itself must be legitimate. *Northeast Ohio Coalition*, 105 F.3d at 1110. Thus, the measure "must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Forsyth County*, 505 U.S. at 130. Second, the court also acknowledged that *Forsyth County* created some limit on the amount the government could charge, based on the potential for a fee to deter protected speech. *Northeast Ohio Coalition*, 105 F.3d at 1110.

We believe that such a framework adequately guards against the dangers discussed by the Court in *Forsyth County* and *Murdock*. First, even if each individual cost assessed reflects a narrowly tailored means of advancing the government's interest, there is still a chance that the fee's total amount will significantly deter constitutionally protected speech. *Forsyth County*, 505 U.S. at 134. Second, upon close consideration, we believe that the dangers highlighted by the *Murdock* Court are subsumed within the *Forsyth County* analysis. If the government's measures are narrowly tailored means of advancing the government's interests, and if the government's estimates of the costs of those measures are reasonable, then transferring those costs to licensees cannot be a facially unconstitutional tax under *Murdock*.

C

Applying those principles here, we must remand this case for further proceedings because there are genuine issues of material fact that preclude granting summary judgment to the County. "[A]ny permit scheme controlling the time, place, and manner of speech must not be based on the content of the message[,] must be narrowly tailored to serve a significant governmental interest," and must not be so high as to deter constitutionally protected speech. *Forsyth County*, 505 U.S. at 130.[13] The County bears the burden of showing that its measures are narrowly tailored. *See Fly Fish, Inc., v. City of Cocoa Beach*, 337 F.3d 1301, 1315 (11th Cir. 2003). *See also Nightclubs*, 202 F.3d at 888 n. 4; *Kentucky Restaurant Concepts v. City of Louisville*, 209 F. Supp. 2d 672, 691-92 (W.D. Ky. 2002); *Bright Lights v. City of Newport*, 830 F. Supp. 378, 386 (E.D. Ky. 1983).

We acknowledge that the regime at issue is not content-neutral, *Alameda Books*, 535 U.S. at 448-50 (Kennedy, J., concurring in the judgment), which raises the possibility that the County is penalizing an unpopular subset of its businesses. There is evidence in the record, for example, that the County charges an operational tax that cannot exceed $50 on businesses outside the adult-entertainment industry. According to the County's license inspector, those other businesses and some of their employees must file applications similar to those required from adult-entertainment establishments. The licensing regime for those businesses also incorporates administrative hearings and point-assessments. Were we confronting a regulation that targeted the press, such differential treatment could only be justified if the County could point to some special characteristic of the press that would warrant the higher fee. *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) ("[D]ifferential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional.").

---

[13]We think that the narrow tailoring of the fees under the second *Forsyth County* element, combined with setting the upper limit of the fee range at the point of speech-deterrence, will "leave open ample alternatives for communication" under the third element. The "ample alternative channels" inquiry seems more appropriately to target behavioral restrictions rather than monetary exactions. If a fee reflects the costs of narrowly tailored measures and will not deter speech, it would be superfluous to apply the third element of *Forsyth County*.

However, the Supreme Court has repeatedly reviewed "secondary effects" ordinances under the degree of scrutiny applicable to content-neutral regulations. *Alameda Books*, 535 U.S. at 448 (Kennedy, J., concurring in the judgment). *See also Renton*, 475 U.S. at 46-47. That is so despite the government's clear differential treatment of adult businesses in those cases. The differential treatment is justified, the Court has held, by the peculiar "secondary effects" associated with adult businesses. As long as the fee differential is justified by the "secondary effects" of adult businesses, we will treat it as content-neutral for *Forsyth County* purposes.

Thus, the *Forsyth County* inquiry collapses into the question of narrow tailoring. The County's choices with regard to the costs it will pass on to licensees are constitutional only if they are "narrowly tailored to serve [the] significant governmental interest" in combating "secondary effects." *Cf. Forsyth County*, 505 U.S. at 130. We cannot conclude that there was no genuine issue of material fact on this issue, and so we must vacate the district court's judgment and remand for further proceedings.

The County has given various estimates of the hours its officials will spend enforcing this Ordinance. The Licensing Inspector, the County says, will spend forty hours attending hearings, forty hours conducting initial inspections of the five establishments in the County, twenty hours conducting follow-up inspections, and forty-two hours listening to "general questions and complaints." In his deposition, though, the County Treasurer said that "we have no background to go on as far as [how] many hearings that would happen or whatever of point assessments."

The County also has incorporated various possibly questionable costs into the fee calculation, including a one-time cost of $15,000 and a yearly amount exceeding $2,500 for the purchase and maintenance of database software, customized for the licensing regime. We cannot say, without more evidence about the necessity of incurring this cost, that a measure whose goal could be reached either by using the County's current computer system or by employing less costly off-the-shelf database software is "narrowly tailored" to advance the County's interests.

Similarly, the County has factored in a $150 per applicant cost for a background check. It is clear from the record that the City of Covington also conducts background checks as part of its licensing regime. A Covington license, though, costs only $150 for any applicant, including for establishments. The County has not explained why its background checks, which it concedes are more expensive than those conducted by Covington, will further the County's interest any more than less-expensive measures.

We also note two other points. First, many of the costs incorporated by the County will be paid only once or will decrease substantially in amount by the second year. Over time, the County's revenues may exceed the costs imposed by the licensees in terms of administering the regime. In that scenario, it would be clear that the fees would not reflect "narrowly tailored" means of reducing secondary effects. Second, the County's retention of $1,500 from denied establishment applicants must reflect only the costs the County incurs in the license denial. Although we make no determinations in this regard, there is a genuine issue as to whether the retention of that amount might far exceed the costs of processing and denying those applications.

The district court failed to undertake any tailoring inquiry in this case, as required by *Forsyth County*, 505 U.S. at 130. After briefly engaging in that inquiry ourselves, we cannot conclude that there was no genuine issue of material fact on this issue. We stress that we have not made any findings about whether the County properly assessed these costs against its licensees. However, the district court must, on remand, engage in an inquiry that determines whether the measures, whose costs were passed on to licensees, were narrowly tailored to advance its interests in combating "secondary effects." *Forsyth County*, 505 U.S. at 130.

Without engaging in further inquiry on this issue, we instruct the district court on remand to determine: (1) whether the fee's total amount will deter the exercise of First Amendment rights; (2) whether the measures associated with the fee's amount are narrowly tailored means of advancing the County's interests; and (3) whether the County's cost estimates for those narrowly tailored measures are reasonable.

## VII

Based on the foregoing, we AFFIRM in part and VACATE in part the judgment of the district court, and REMAND for further proceedings consistent with this opinion.

---

**DISSENTING IN PART AND CONCURRING IN PART**

---

CLAY, Circuit Judge, dissenting in part and concurring in part. Kenton County Ordinance No. 451.12 purports to address the "secondary effects" of adult entertainment establishments by imposing a licensing scheme that requires businesses to apply for business licenses, pay annual fees, and abide by restrictions on the conduct of employees. I respectfully dissent from the majority opinion because Ordinance No. 451.12 is insufficiently narrowly-tailored to survive intermediate scrutiny, fails to provide prompt judicial review, and imposes excessive licensing fees. However, I agree with the majority's analysis of the Contracts Clause issue in Section IV of its opinion.

I.

Kenton County Ordinance No. 451.12 attempts to target the negative "secondary effects" of adult entertainment establishments such as prostitution and other illicit sexual conduct by requiring entertainers to "maintain a minimum distance of five (5) feet from areas on the establishment's premises being occupied by customers, for a minimum of one (1) hour after the entertainer appears semi-nude on the establishment's premises." Ordinance No. 451.12 § 14(a)(10).

A restriction on adult entertainment that affects protected expression and is designed to decrease the secondary effects of such expression is subject to intermediate scrutiny. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J., concurring)[1]. The intermediate scrutiny test is governed by *United States v. O'Brien*, 391 U.S. 367 (1968). According to the *O'Brien* court, "a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien,* 391 U.S. at 377. *Accord Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 653 (6th Cir. 2007). Although legislatures may regulate adult entertainment establishments in order to address secondary effects such as crime and prostitution, this regulation must be crafted so that "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377.

Ordinance No. 451.12 falls far short of this objective. The ordinance forbids entertainers from coming within five feet of customer-occupied areas for an hour after the entertainers' performances. As the majority notes, this provision would "leave few, if any, gaps during which entertainers who dance semi-nude on a given night could commingle with customers." Maj. Op. at 5. At the very least it would "reduce both the number of entertainers available to mingle and the amount of time they can spend mingling." Maj. Op. at 5. One cannot credibly assert that this stringent restriction leaves "the quantity and accessibility of speech substantially intact." *Alameda Books*, 535 U.S. at 449-50 (Kennedy, J., concurring).

As a result of the ordinance's restrictions, patrons and entertainers are prohibited not only from physical contact or solicitation of prostitution, but also from conversation on any subject. Although the County has a legitimate interest in decreasing the incidence of prostitution, it may not go to any length to achieve this goal. Regardless of whether entertainers and customers wish to

---

[1]Justice Kennedy's concurring opinion has precedential authority inasmuch as his opinion concurred in the judgment of the plurality on the narrowest basis. *See Marks v. United States*, 430 U.S. 188, 193 (1977). *Accord Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 132 (6th Cir. 1994).

continue to develop the erotic fantasy created on stage or whether they wish to talk about an upcoming political election or any other topic, Ordinance No. 451.12 severely limits their ability to do so.   An ordinance that restricts interaction to such a degree that the most viable options for conversation between patrons and entertainers include communication "via cellular phone, closed-circuit television, or electronic chat," Maj. Op. at 5, clearly decreases and substantially interferes with the quantity and accessibility of speech.

The contradictions between the majority's discussion of the effectiveness of the regulation and its discussion of the narrow-tailoring requirement reveal the fatal weakness in Ordinance No. 451.12's regulatory scheme.  Although the language of the ordinance highlights the need to prevent illicit sexual contact and prostitution, the regulation purports to attempt to decrease the incidence of prostitution by decreasing the opportunities for entertainers and customers to talk to each other. (J.A. 136, 141 (a drafter of the ordinance discussing the desire to decrease the "opportunity for negotiations")).)   Thus, the potential effectiveness of this ordinance in deterring prostitution is directly proportional to its effectiveness at foreclosing opportunities for speech. The Supreme Court has expressly stated that a regulation that works in this way is unconstitutional.  In his concurring opinion in *Alameda Books*, Justice Kennedy repeatedly emphasized that "[a] city may not assert that it will reduce secondary effects by reducing speech in the same proportion."  *Alameda Books,* 535 U.S. at 449 (Kennedy, J., concurring).  *See id.* at 450 (Kennedy, J., concurring) ("It is no trick to reduce secondary effects by reducing speech or its audience; but a city may not attack secondary effects indirectly by attacking speech.").

A key factor in many of the ordinances that courts have determined to be narrowly tailored is the ordinances' regulation of conduct and not the expression of the entertainers.  For example, in *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000), the Supreme Court upheld an ordinance that required dancers to wear pasties and G-strings while performing.  The Court noted that nudity itself was not the message being expressed in nude dance.  *Pap's A.M.*, 529 U.S. at 289.  Therefore, the Court held that the restrictions contained in the ordinance were narrowly tailored to the government's interest in public health and safety because "[t]he ordinance regulates conduct, and any incidental impact on the expressive element of nude dancing is *de minimis*."  *Id.* at 301.

Under some circumstances, this Court has upheld statutes that require buffer zones between semi-nude entertainers and patrons while the entertainers are dancing.  In *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403 (6th Cir. 1997), the ordinance at issue required dancers to remain six feet away from customers during performances.  *Id.* at 408.  The buffer zone was found to be narrowly tailored to address disease transmission and violent crime concerns.  *Id.* at 413.  However, the ordinance challenged in *DLS* was found to be narrowly tailored because it addressed problems that occurred due to the near nudity of dancers during the up-close performances, such as dances involving the licking of whipped cream from dancers' bodies and the potentially violent propensities of men desiring to be in close proximity with near-nude dancers.  *Id.*  These concerns are not at issue here since the entertainers are fully clothed while conversing with patrons.

The effect of buffer zones on the ability to converse with patrons was not discussed in *DLS*; however, it was at issue in *Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville and Davidson County, Tennessee*, 274. F.3d 377 (6th Cir. 2001), in which this Court upheld an ordinance that imposed a three-foot buffer zone between entertainers and customers during performances. The plaintiffs contended that the ordinance violated entertainers' First Amendment rights by limiting conversation, but, despite its recognition of entertainers' rights to free expressive association, the court upheld the buffer zone in part because customers and entertainers could still converse from a three-foot distance.  *Id.* at 396.  The court held that the governmental interest in preventing prostitution and the spread of disease through transfer of bodily fluids justified the distance requirement between customers and semi-nude performers.  *Id.* at 396-97.  In the instant case, the provision restricting patron-entertainer interaction goes farther than the regulation at issue in *Deja*

*Vu of Nashville* by requiring fully-clothed entertainers who are not dancing to remain five feet away from customer-occupied areas, well outside of a range within which normal conversation could occur.

As demonstrated by *DLS* and *Deja Vu of Nashville*, ordinances that impose a distance requirement while an entertainer is performing semi-nude are on firmer constitutional ground than the ordinance at issue in this case. The ordinances previously upheld by this Court targeted the real danger of immediate illicit sexual contact instead of targeting speech that purportedly *could* lead to future prostitution. The ordinances involved regulation of physical contact which is incidental to the entertainer's erotic message. To the extent physical contact is a part of the erotic message, the ordinances attempted to narrowly tailor restrictions to the goal of preventing illicit sexual contact by prohibiting contact while nude or semi-nude entertainers are dancing. However, Ordinance No. 451.12's effective prohibition on virtually all communication, including innocuous conversations, is not narrowly tailored to these goals.

II.

Ordinance No. 451.12's licensing scheme acts as an unconstitutional prior restraint on protected speech. "A 'prior restraint' exists when the exercise of a First Amendment right depends on the prior approval of public officials." *Deja Vu of Nashville, Inc.*, 274 F.3d at 400. This Court has recognized that "any system of prior restraint carries a heavy presumption against its validity." *Id.* at 391. "Licensing schemes in a city ordinance regulating sexually oriented businesses constitute a prior restraint that must incorporate at least the first two *Freedman* [*v. Maryland*, 3 80 U.S. 51, 59 (1965)] procedural safeguards" in order to avoid being deemed an impermissible prior restraint. *Id.* at 400-01. The first *Freedman* safeguard requires the issuance of a license within a "specified and reasonable time period during which the status quo is maintained." *Deja Vu of Cincinnati, L.L.C. v. Union Township Board of Trustees*, 411 F.3d. 777, 786 (6th Cir. 2005) (en banc) (quoting *FW/PBS Inc. v. City of Dallas*, 493 U.S. 215, 228 (1990)). The second *Freedman* safeguard requires the assurance of a "prompt final judicial decision" when an applicant appeals an adverse licensing action. *Freedman*, 80 U.S. at 59. The Supreme Court has recently clarified that this second factor will in most cases be satisfied by allowing applicants to appeal license denials through a state's ordinary judicial review process. *City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004). Thus, in order for a licensing ordinance regulating sexually oriented businesses to be constitutional, it must ensure the maintenance of the status quo until a prompt final judicial decision is reached regarding an adverse licensing decision. *Deja Vu of Cincinnati*, 411 F.3d at 786. *Accord Odle v. Decatur County, Tennessee*, 421 F.3d 386, 389 (6th Cir. 2005).

Kenton County Ordinance No. 451.12 acts as an unconstitutional prior restraint on speech inasmuch as it does not allow for prompt judicial review of license suspensions and revocations and does not provide for the maintenance of the status quo in some cases. Section 17 governs hearings regarding violations of the ordinance. Ordinance No. 451.12 § 17. These hearings are distinct from hearings governed by Section 16 to determine whether points should be assessed for ordinance violations. Section 17 provides that when a License Inspector receives credible information regarding a violation of the ordinance she must schedule a hearing to occur ten to thirty days later. After the hearing, the Hearing Officer must issue an order "dismiss[ing] the complaint, or suspend[ing] or revok[ing] a license or permit previously issued, or renew[ing] or refus[ing] to renew a license previously issued." § 17(b)(3). However, no time limits are placed on the issuance of this order, and as a result, the administrative decision can be delayed for an indeterminate period. In addition, a party may only seek judicial review after receiving the decision of the Hearing Officer. § 17(d). Thus, license holders may wait an indeterminately long time for an administrative decision.

License holders are also deprived of the maintenance of the status quo under Ordinance No. 451.12. Section 19 of the ordinance states that the status quo will be maintained while an applicant

seeks judicial review, but the ordinance makes no such provision for license holders seeking to renew their licenses or defending against alleged licensing infractions. Because the ordinance does not provide prompt judicial review to all license holders and does not maintain the status quo for those license holders who seek judicial review, Ordinance No. 451.12 does not contain the first *Freedman* safeguard and should thus be declared unconstitutional.

In its discussion of the constitutionality of Ordinance No. 451.12's judicial review provisions, the majority claims that the ordinance is ambiguous regarding the rights of licensees when licenses are suspended or revoked. The majority also concedes that the omissions causing this "ambiguity" were probably intentional. Maj. Op. at 9. The majority attempts to support its contention that the status quo is maintained during the review process for all categories of licensees by invoking the government's unclear and entirely equivocal concessions at oral argument. Maj. Op. at 10. This Court has expressly stated that "assurances offered by the relevant local authorities that the ordinance will not be put to [unconstitutional] effect in the future" are not sufficient to save an ordinance that is unconstitutional on its face. *Odle*, 421 F.3d at 397. *See Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 891 n.6 (6th Cir. 2000) ("First Amendment rights would rest on a very thin reed indeed if the promises of a city attorney at oral argument were alone sufficient to authoritatively limit the meaning of an ordinance."). When statutes have a possible constitutional and unconstitutional interpretation, courts are to give them a reasonable interpretation in order to save them from unconstitutionality. *Odle*, 421 F.3d at 396. But there are no competing reasonable interpretations in this case, and to insert language in the statute in order to rewrite it would go beyond this Court's role of interpretation. *See Eubanks v. Wilinson*, 937 F.2d 1118, 1122 (6th Cir. 1991) ("[T]he general federal rule is that courts do not rewrite statutes to create constitutionality."). Thus, Ordinance No. 451.12 should be declared unconstitutional because it fails to provide prompt judicial review and the maintenance of the status quo for license holders faced with the revocation or suspension of their licenses.

III.

Kenton County Ordinance No. 451.12 requires adult entertainment establishments as well as their employees to procure licenses. According to the ordinance, the business license fee is $3000 annually, with a 50% refund to be made if the license is denied. Additionally, managers and entertainers must pay $155 annually for individual licenses. Licenses are to be issued to applicants who can satisfy a background check and submit a completed application with the required fees. The record demonstrates that these license fees are unconstitutionally excessive.

Generally, a state may not impose a fee upon the exercise of a constitutionally guaranteed right. "A license tax applied to activities guaranteed by the First Amendment would have [a] . . . destructive effect." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943). Despite this rule, the Supreme Court has held that a license fee may be imposed as long as the fee is "a nominal one, imposed as a regulatory measure and calculated to defray the expenses of protecting those on the streets and at home against the abuses of solicitors." *Id*. at 116. As this Court has explained, "an ordinance requiring a person to pay a license or permit fee before he can engage in a constitutionally protected activity does not violate the Constitution so long as the purpose of charging the fee is limited to defraying expenses incurred in furtherance of a legitimate state interest." *Northeast Ohio Coalition for the Homeless v. City of Cleveland*, 105 F.3d 1107, 1109-1110 (6th Cir. 1997). The fee will be upheld so long as it is "reasonably related to the expenses incident to the administration of the ordinance." *Id*. at 1110.

The Eleventh Circuit has applied this rule specifically in the context of adult entertainment establishments and concluded that "a licensing fee on adult entertainment establishments . . . must be reasonably related to recouping the costs of administering the licensing program." *Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1315 (11th Cir. 2003). Accordingly, "it is the City's burden

to establish that its licensing fee is justified by the cost of processing the application." *Id*. The record must support the contention that the city has made reasonable efforts to ascertain the costs associated with the licensing program.

The Supreme Court has further noted that the amount of any fee cannot be tied to the content of speech. Importantly, the Court was confronted with an ordinance that required speakers to pay a fee in order to use public lands. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992). In *Forsyth County* the fee increased depending on "the amount of hostility likely to be created by the speech based on its content." *Id*. Those speakers with more controversial messages would have to pay more because they would require increased police presence. *Id*. The Court determined that such a rule was unconstitutional because it increased the fee a speaker had to pay based on the content of the speech. *Id*. at 136-37. As Justice Kennedy reiterated in *Alameda Books*:

> A city may not, for example, impose a content-based fee or tax. See *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 230, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) ("[O]fficial scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible with the First Amendment's guarantee of freedom of the press"). This is true even if the government purports to justify the fee by reference to secondary effects.

*Alameda Books*, 535 U.S. at 445 (Kennedy, J., concurring).

In the instant case, Kenton County has given a detailed explanation of its rationale for the license fees. The County's cost estimates include an initial cost of over $15,000 and an annual cost of over $2,500 for the creation and maintenance of a database for the licensing scheme. The County also claims that background checks will cost $150 per person because of an extensive investigation of each applicant. However, the County has not accounted for the difference between this cost and the substantially lower costs of background checks in nearby jurisdictions. In addition, the County has given no basis for its retention of fifty percent of the license fee for those applicants who are denied licenses. Thus, the County has not shown that the fee is based upon its reasonable costs for the administration of the licensing program. *Northeast Ohio Coalition for the Homeless,* 105 F.3d at 1110.

The majority opinion attempts to address the issue of excessive licensing fees and remands to the district court for further consideration of whether these fees are narrowly tailored to the purpose of reducing the secondary effects of adult entertainment. The majority claims that "there are genuine issues of material fact that preclude granting summary judgment to the County." Maj. Op. at 14. Yet there is already evidence that the County used exorbitant cost estimates to justify levying high fees on license applicants and no countervailing evidence on the record to suggest that the amount of the fees are justifiable. These excessive costs render the licensing fee portion of the statute unconstitutional, and we should so hold.

## CONCLUSION

Kenton County Ordinance 451.12 substantially diminishes the quantity and accessibility of protected expression, imposes a prior restraint on the exercise of protected expression without the opportunity for prompt judicial review, and imposes excessive fees on license applicants. As a result, this ordinance should be held to be unconstitutional.